```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                       SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA        Criminal No.  RWT-12-0480

 4        v.                         Greenbelt, Maryland

 5   JOSE JOAQUIN MORALES,           September 20, 2013

 6            Defendant.             9:00 a.m.

 7   -------------------------/

 8                   TRANSCRIPT OF MOTIONS HEARING
                  BEFORE THE HONORABLE ROGER W. TITUS
 9                   UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:      United States Attorney's Office
                             By: SANDRA WILKINSON, ESQUIRE
12                                MARTIN CLARKE, ESQUIRE
                             36 South Charles Street
13                           Baltimore, Maryland 21201

14   For the Defendant:      Law Offices of Gary E. Proctor, LLC
                             By: GARY E. PROCTOR, ESQUIRE
15                           Eight East Mulberry Street
                             Baltimore, Maryland 21202
16
                             Law Office of Jonathan Zucker
17                           By: JONATHAN S. ZUCKER, ESQUIRE
                             1350 Connecticut Avenue, NW
18                           Suite 202
                             Washington, D.C. 20036
19

20
     Court Reporter         Lisa K. Bankins RMR
21                          United States District Court
                            6500 Cherrywood Lane
22                          Greenbelt, Maryland 20770

23

24   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
25
```

1

1                           TABLE OF CONTENTS
                                  TRIAL
2                               WITNESSES

3     On behalf of the Defense:

4     ERIC JARVIS

5     Direct examination by Mr. Proctor.......... 20
      Cross-examination by Ms. Wilkinson........ 37
6     Redirect examination by Mr. Proctor........ 53
      Recross-examination by MS. WILKINSON....... 59
7     Redirect examination by Mr. Proctor........ 60

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            MS. WILKINSON:  Good morning, Judge Titus.

3    Calling the matter of United States of America v. Jose

4    Morales, Criminal Number RWT-12-0480.  Sandra Wilkinson

5    and Martin Clarke on behalf of the U.S. Attorney's Office.

6    With us at counsel table, Special Agent Mark Royka from

7    the D.E.A.  We're here today for a motions hearing prior

8    to a Tuesday, September 24th trial date.

9            THE COURT:  All right.

10           MR. ZUCKER:  Jonathan Zucker on behalf of Mr.

11   Morales.  With the Court's permission, Meghan Moore is a

12   student intern if the Court would allow her to sit in.

13           THE COURT:  Happy to have her with us.  I hope

14   she can learn something.

15           MR. ZUCKER:  Thank you.

16           MR. PROCTOR:  Good morning, Your Honor.  Gary

17   Proctor --

18           THE COURT:  Good morning.

19           MR. PROCTOR:  -- for Mr. Morales, who is seated

20   to my right.

21           THE COURT:  All right.  Before we get into the

22   matters today, I don't believe anybody has filed

23   instructions yet.  While in a four-week trial, it's not

24   critical to have them on the first day.  But one thing I

25   really, really need to have from you is an uncontroverted

 1    instruction as to the elements of the crime because it's

 2    my practice in preliminary instructions to the jury which

 3    is a form that reads -- to tell them what the elements are

 4    so that they can be listening to see whether the elements

 5    have been proven or not.  I assume with a single count

 6    case like this that the elements can't be very

 7    controversial.

 8              MS. WILKINSON:  I think there are some -- well,

 9    first, Your Honor, we have completed government proposed

10    instructions.  We provided them to the defense this

11    weekend or something.  And Mr. Proctor has given me

12    detailed agreements and challenges to them.  I have taken

13    them and incorporated them, but I haven't put my eyes on

14    them enough --

15              THE COURT:  Is there any big problem on the

16    elements?

17              MS. WILKINSON:  Not on the elements themselves

18    like a Sand instruction.  There are nuances in the laws,

19    instructions the government is requesting and I think that

20    the defense are as well, but not on the basic --

21              THE COURT:  What I'm looking for is undisputed

22    elements.  Not the discussion of the elements.

23              MS. WILKINSON:  Right.

24              THE COURT:  You know somebody did something with

25    the intent to do da-ta-da, something like that.  Whatever

1   the elements are.

2          MS. WILKINSON:  I can provide that.

3          THE COURT:  I just need that so that I'm

4   comfortable giving that without of controversy on the

5   first day of trial.

6          MS. WILKINSON:  I'll talk to Mr. Proctor about

7   it after the hearing.  But there are Sand instructions.

8   They are very simplistic.  They're physically three

9   elements and I'll provide them to the Court.

10          THE COURT:  Well, all of you at one time or

11   another or most of you at one time or another have been

12   through a trial with me.  But my practice is to take those

13   instructions that have been submitted to me and mark them

14   up as we go during the trial.  And at some point when it

15   looks like the instructions are pretty close to okay based

16   upon what the evidence has been to give them to the

17   counsel marked up so you can see what I did.

18          Most of what I do to Sand and Seifurt

19   instructions is to get rid of redundancies and stop

20   calling myself the court which I don't like doing because

21   my name is Roger Titus, not the court.  So all right.  One

22   other preliminary matter --

23          THE DEFENDANT:  Can I speak on the jury

24   instructions?

25          THE COURT:  One second, sir.  I'm talking right

1    now.  Okay.  The marshal has asked me to raise with the

2    parties the question of incarcerated witnesses who have

3    been writted in.  They all have been writted in for

4    Tuesday.  So we're going to have a traffic jam of

5    witnesses sitting here.  Can you confer with each other

6    and let me know what are the days they actually need to be

7    here so we don't keep trucking people back and forth?

8             MS. WILKINSON:  Of course.  And we would rather

9    that be, Your Honor.  Obviously, I don't believe they were

10   all for Tuesday, but I will talk to --

11            THE COURT:  I don't know your witness list and I

12   don't know who's calling incarcerated witnesses.  But it

13   seems to me that both sides are calling incarcerated

14   witnesses.  So I'm asking you as officers of the court to

15   talk to each other and please let the marshal know with

16   plenty of advance notice who needs to be here on what day.

17   But they've all been subpoenaed for the first day of trial

18   which is not going to work.

19            And I want to remind you that I have practices

20   that I follow in connection with trials which are pretty

21   simple.  But I want to have at the close of business each

22   day, whoever's side is going, whether it's prosecution or

23   defense, to disclose to the other side who the witnesses

24   are for the next day and what the documents are that are

25   going to be offered the next day so that people can go

1    home and prepare for the right witnesses and the right

2    documents and that applies to both sides.  So in the case

3    of the government, you need to be able -- I don't know if

4    we are going to get to witnesses on Tuesday or not.  But

5    you should be able to tell the defense who those people

6    are going to be on the first day of trial by Monday.

7             MS. WILKINSON:  In fact I've already talked to

8    Mr. Proctor about the beginning of the trial and who the

9    potential witnesses are.

10            THE COURT:  And I believe Mr. Morales has some

11   question.

12            THE DEFENDANT:  No.  I just want to go on record

13   about the jury instructions.  Anything that's modified or

14   substituted from Sand, I want to object to it and I want

15   to know exactly everything that's modified on it.

16            THE COURT:  Sir, I can't rule on anything until

17   there's something to object to.  But I -- sir, you got

18   counsel representing you.  So --

19            THE DEFENDANT:  I still want to put on the

20   record --

21            THE COURT:  Well, you've got on the record with

22   regard to any modifications of Sand and Seifurt that I

23   make to them, you'll see.  And one page at a time, we'll

24   go through the instructions.  And any objections to any

25   edit made by me or anybody else can be addressed at that

1   time.

2          THE DEFENDANT:  Thank you.

3          MS. WILKINSON:  And, Your Honor, I'd like to

4   make it clear as the Court just did that Mr. Morales has

5   counsel and that he is not here to represent himself and

6   obviously, the Court directs what happens in the

7   courtroom --

8          THE COURT:  I think I made that clear to

9   Mr. Morales.  Mr. Morales, you have attorneys, very, very

10  good attorneys representing you.  If you have a concern

11  about the instructions, you communicate that to them --

12  those objections to the attorneys and they will raise them

13  with me.  They're trained in doing that and they'll do a

14  fine job.  Most of the edits that I make to these

15  instructions are going to be style.  And if anybody thinks

16  style is in fact substance, we can address that when and

17  if it happens.

18          All right.  Now this case is set for four trial

19  weeks of four days a week.  It really can't go longer than

20  that because of stuff right behind it.  So --

21          MS. WILKINSON:  And, Your Honor, I think you

22  will be glad to know I've spoken to defense counsel and we

23  have really worked hard on some agreements and who our

24  witnesses will be and I think at the end of the day, the

25  government should be able to get their case in in two good

1    solid trial weeks.  So I think we will get it done in

2    three weeks.

3              THE COURT:  All right.  I just want to make sure

4    that I was not sitting in front of people who think this

5    is going to be a six-week trial because we can't do that.

6              My plans are to impanel four alternate jurors

7    because of the length of the trial.  And I will pray that

8    we get through the jury selection without too much of a

9    crisis for jurors who have to be stuck here in Greenbelt

10   for four days a week for four weeks.

11             Most of you probably know this.  But in

12   connection with the voir dire, the voir dire you have

13   given me and I'm reviewing that now, I'm going to divide

14   that into two basic categories.  One is the questions that

15   you will be happy to answer in front of strangers and the

16   others is ones you would not.

17             And I will with respect to the ones that are

18   more sensitive, I will reduce them to bullet points.  I

19   will put a bullet point version on them on the screen.

20   You can look at the bullet point version before I do it.

21   That's so that I can read ten or so questions and they can

22   see the shorthand version of them while they're sitting

23   there.  They will also be up when they come up to the

24   bench to review it.

25             If you have objections to a juror when that

jurors comes up here, please make the objection before the
next juror comes up.  Otherwise, you will have waived your
objection.  I can't a half an hour after I've interviewed
a juror have an objection raised that could have been
raised when the juror was up here.

I believe based upon my intention to impanel
four alternate jurors, that we will have the capacity to
pick a jury once we get through and do not have any
objections to 36 jurors.  That's on the basis of a jury of
16 people plus 6 strikes for the government, 10 for the
defense, 2 for the government alternates, 2 for the
defense and alternates.  That's my reading of the rules.
So I think 36 is the magic number unless you think my math
is not correct and I don't profess to be a mathematician.

All right.  Well, let's start going through the
matters today.  Some of these are not going to take much
time.  Some of them may take more time.  So does the
government have any particular preference on how we go
down this?  I printed up the list for all the open
motions.  There are some additional motions that have come
in since I first prepared this.

One I think I can dispose of pretty quickly is
the Document 103 which is a motion for reduction of
presentence reports of government witnesses.  That is not
generally done as a matter of course.  So I need to have

1    some particular demonstration with respect to any

2    particular witness.  You don't have a right to go fishing

3    through a presentence report.  I in ten years I think I've

4    authorized inspection of a presentence report, but in

5    redacted form once.  So I need to have a proffer as to

6    something other than I'd like to look at the presentence

7    report.  So if you have additional grounds for seeking

8    presentence reports, let me know.

9            MR. PROCTOR:  There's two things, judge.  First

10   of all, every plea offer says if you're a career offender,

11   your numbers go up.

12           THE COURT:  You have to get close to the mic.

13           MR. PROCTOR:  Sorry.  Specifically, we're

14   dealing with career offenders.  I have the NCIC reports.

15   As you probably know, they're hard to read.  They're

16   double dutch.  I can't determine if someone is a career

17   offender based on an NCIC report.

18           The presentence report will make it crystal

19   clear.  This person has two qualifying convictions being

20   these two on these dates and is, therefore, a criminal

21   offender.  When we're talking about the benefits of

22   cooperation, as the Court knows, if you're a career

23   offender, the benefits to cooperation are manifestly more.

24   So that's one thing.

25           The second thing is in the presentence report,

1    probation officers typically ask do you have any mental

2    health issues, do you have any substance abuse history?

3              THE COURT:  Well, do you have any information

4    that would indicate one of these witnesses does have any

5    of those issues?

6              MR. PROCTOR:  Yes, sir.

7              THE COURT:  Well, then you need to -- I mean I

8    don't think I need to spend a lot of time on this today.

9    You need witness by witness to tell me what it is that you

10   think is in the presentence report that would be

11   appropriate for disclosure under the case law in the

12   Fourth Circuit and I will be glad to entertain it at that

13   time.

14             The one and only time I did this, the -- I have

15   access, of course, to the full presentence report.  The

16   government gave me what they thought would be consistent

17   with their obligations of disclosure in fairness to you a

18   redacted version.  I looked at the redacted version.  It

19   was very heavily redacted because of very large amounts of

20   a presentence report are not appropriate for disclosure.

21   And I disclosed some of the information from the

22   presentence report.  I'm willing to do that process, but

23   you have to make a showing that is required in the Fourth

24   Circuit for that witness by witness.

25             So I'm going to deny your motion without

1    prejudice to your right to renew the motion with respect

2    to witness by witness.

3            If you believe that the issue is going to arise

4    in connection with Mr. Jones who's going to testify on

5    Thursday, don't raise it on Thursday.  Let me know

6    Wednesday that or Wednesday morning that there's a witness

7    coming on Thursday or some day after Wednesday that you

8    think you'd like to see all or portions of a presentence

9    report.  Talk to the government counsel.  Maybe you can

10   work something out.  But I'm more than happy if you made

11   that requisite showing to look at the unredacted

12   presentence report and the one that has the information

13   that would be disclosable to you for the reasons that

14   you've indicated and I'll be glad to do that.

15           So I'm going to deny 103 without prejudice.  You

16   can renew your motion witness by witness.  As I said, do

17   it in advance of the time when the witness is going to

18   testify.  Okay?

19           MR. PROCTOR:  Yes, sir.

20           THE COURT:  That takes care of 103.  I

21   believe -- I've got a chart of motions here that somebody

22   prepared.  But the first one, this says 14.  That's not

23   the correct docket number.  I think it's 17.

24           MS. WILKINSON:  Oh, sorry about that, Your

25   Honor.

1          THE COURT:  And I think in connection with that

2    motion, 17, that the documents have been provided to the

3    defense and it's moot.  Is that correct?

4          MS. WILKINSON:  Yes, Your Honor.  That's the --

5          THE COURT:  Any dispute about that?

6          MR. PROCTOR:  No, sir.

7          THE COURT:  So I'm going to go down my little

8    list of motions here.  17 will be denied as moot.  I said

9    103 is denied without prejudice that we know.

10          MR. ZUCKER:  Judge, can we raise another matter

11   scheduling-wise?  There's a witness, another lawyer from

12   Florida that has brought in -- Texas.

13          THE COURT:  Is he here?

14          MR. ZUCKER:  He's in the courtroom.  He's Mr.

15   Morales' private counsel -- a prior counsel.  I think he

16   would like to get out of here and --

17          THE COURT:  Let me see if I can take care of a

18   couple of minor ones and then we will go right into that

19   motion --

20          MR. ZUCKER:  Perfect.  Thank you, judge.

21          MR. PROCTOR:  That would be 58, Your Honor.

22          THE COURT:  58.  Okay.  58 I think is going to

23   take a little time to go through that.  So let me just see

24   if I can get rid of some simple ones.

25          The next one I have is 50 and that's a request

1    for alibi notice.  And is there any response on that?

2              MR. PROCTOR:  We are not intending to introduce

3    an alibi.

4              THE COURT:  All right.  Then that is moot.  We

5    don't need to go any further on that one.

6              Then I've got that -- well, I think 54, 58 and

7    78 are all one package.  So we are going to have to do

8    this one at a time.

9              Another one I think that's probably routine is

10   Number 81 which is the government's motion to unseal

11   certain documents.  There was no response given to that.

12   Unless there's an objection, I will grant that motion.

13             MR. PROCTOR:  There's no objection.

14             THE COURT:  All right.  Then I will grant that

15   one.

16             I've already granted 82 which was the motion to

17   correct a typographical error in the indictment and that's

18   done.

19             The defendant moved in Number 86 for disclosure

20   of 404 evidence and the government has responded.  Do you

21   need anything more than that?

22             MR. ZUCKER:  I think we need to argue whether or

23   not it's properly intrinsic.  They filed their response

24   saying this is what we intend to introduce and we view it

25   as intrinsic.  We take a different view and believe --

1          THE COURT:  Well, that relates to a huge

2     universe of things --

3          MR. ZUCKER:  It does.

4          THE COURT:  -- that I can't -- I mean I really

5     can't on a pretrial basis make a global ruling on that.

6          MR. ZUCKER:  I think there are some of them that

7     we won't object to and then there is some that we will.

8     So if you want to at least flag the issue so you'll have

9     our thoughts on it and then decide --

10          THE COURT:  What I'm going to do, I'm going to

11     deny this without prejudice to your right to object on any

12     allegedly 404(b) evidence as being offered by the

13     government.  Their position is some of its intrinsic.

14     That it's covered by the exceptions under 404(b).  But I

15     can't make a global ruling on it because there's a large

16     universe of evidence that's subject to this motion.

17          MR. ZUCKER:  I think we can probably move in

18     limine on some of them.  And then if not, since we are

19     going to be objecting, I guess the question becomes will

20     it be referenced in openings.  And some we're not going to

21     object to at all and those are fair game and we might as

22     well clarify that.

23          THE COURT:  Before we finish today, I want to

24     talk about what are the hot button issues that people

25     think shouldn't be mentioned in opening and I can address

16

1      the question of whether I'm going to tell them don't

2      mention those things in opening.

3              MR. ZUCKER:  Okay.

4              THE COURT:  But I'm going to deny the

5      defendant's motion without prejudice to make individual

6      objections during trial to specific evidence.  And I do

7      understand Rule 404(b) and intrinsic and extrinsic and so

8      forth.

9              MR. ZUCKER:  I'd just ask if we can address what

10     we can pretrial so we know what's coming in.

11             THE COURT:  Okay.  All right.  I think we can --

12     let's go into the one where we have the witness from Texas

13     here.  The government's made a notice of what it intends

14     to offer in 54.  The defendant has moved to suppress and

15     the government has responded in 78.  So this is a --

16     essentially, a defense motion to suppress.  So let me hear

17     you on that.

18             MR. PROCTOR:  Well, there is, Your Honor.  But I

19     guess there's also the question of voluntariness and I'm

20     assuming the government is going to call an agent outside

21     the presence of the jury later with regard to that.

22             MS. WILKINSON:  I have so indicated to

23     Mr. Proctor and Mr. Zucker and I can do that with the

24     agents actually from Texas in one fell swoop.  But also we

25     would make the argument that it was per se voluntary

1    because his attorney was sitting right next to him when he

2    made these statements.

3               THE COURT:  I mean there's several issues in

4    this motion.  But the one I want to focus on is the theory

5    that the defense has advanced as to advice given in Texas

6    somehow making excludable here.  That's what I want to

7    hear about.  I mean the question of whether it's voluntary

8    because it was in an incarcerated setting, we'll deal with

9    that on a factual basis.  I have to look at the totality

10   of the circumstances and see whether under all those

11   circumstances, it was voluntary or involuntary.

12              MR. ZUCKER:  Judge, a few moments to consult

13   with Mr. Proctor.

14              THE COURT:  I can't hear you, sir.

15              MR. ZUCKER:  Just a quick moment to consult with

16   Mr. Proctor.

17              MR. PROCTOR:  At this time we would call Eric

18   Jarvis.

19              THE COURT:  All right.

20              THE CLERK:  If you could just step up there and

21   raise your right hand for me, please?

22   Thereupon,

23                         ERIC JARVIS,

24   having been called as a witness on behalf of the

25   defense and having been first duly sworn by the

DIRECT EXAMINATION OF JARVIS

```
 1    Deputy Clerk, was examined and testified as follows:
 2              THE CLERK:  Thank you.  Please be seated.
 3              MR. PROCTOR:  And, judge, as a preliminary
 4    matter, Mr. Jarvis raised with me and I think he's
 5    correct.  He did represent Mr. Morales.  There would be an
 6    attorney/client privilege.  To be clear, I'm not getting
 7    into the substance of any conversations he had with
 8    Mr. Morales.  What Mr. Morales said to him, what he said
 9    to Mr. Morale, anything like that.  So I don't believe
10    there is any attorney/client privilege to be waived.  It's
11    the chronology and who was there and where the meetings
12    occurred and that sort of stuff.
13              THE COURT:  It really depends on the question.
14    I don't know until I hear a question whether there's an
15    attorney/client question to be raised at all.
16              MR. PROCTOR:  Okay.
17              THE COURT:  I think what you're telling is that
18    Mr. Morales does not waive attorney/client privilege with
19    respect to the --
20              MR. PROCTOR:  Well, to the extent it comes up,
21    then --
22              THE COURT:  I mean this is a rather unique use
23    of Strickland and other things like that.  But I mean if
24    you're attacking what he did, does that not have an
25    implications for whether or not he can respond as to why
```

 1    he did what he did --

 2            MR. PROCTOR:  Well, I guess --

 3            THE COURT:  -- which may take into account what

 4    he was told by his client?

 5            MR. PROCTOR:  Well, you're right and we'll jump

 6    in and if --

 7            THE COURT:  Let's do one question at a time.

 8            THE CLERK:  Okay.  Excuse me.  Could I just get

 9    the witness to state his name for the record, please?

10            THE WITNESS:  Eric Jarvis.

11            THE CLERK:  Spell the last name for me.

12            THE WITNESS:  J-A-R-V-I-S.

13            THE CLERK:  Thank you.

14                         DIRECT EXAMINATION

15            BY MR. PROCTOR:

16       Q    Good morning, Mr. Jarvis.

17       A    Good morning.

18       Q    And we all appreciate you being here all the way

19    from McAllen on short notice.  That gentleman sitting over

20    there in the jumpsuit.  Do you recognize him?

21       A    Yes, sir.

22       Q    What is his name?

23       A    Jose Joaquin Morales.

24       Q    And to step back a moment, what is your

25    profession?

DIRECT EXAMINATION OF JARVIS

1    A    I'm an attorney.

2    Q    And where do you practice?

3    A    In McAllen, Texas.

4    Q    And how long have you been an attorney?

5    A    Since 1999.

6    Q    And what is the focus of your practice?

7    A    The majority of my practice is criminal defense

8  work.

9    Q    Okay.  State or federal or both?

10   A    Both.

11   Q    And in that regard, have you had all manner of

12 cases from murders to traffic tickets?

13   A    In terms of federal traffic tickets, no.

14   Q    No.  State.

15   A    To clarify, I have not had a murder.

16   Q    Okay.  And do you recall being contacted by

17 someone associated with Mr. Morales back in August of

18 2008?

19   A    Before I answer that, that's something that I

20 would like to get clarification from Judge Titus on.  My

21 understanding -- and I did listen to the exchange.  In

22 addition to the attorney/client privilege that you all

23 have discussed, my view is that in addition to the

24 attorney/client privilege, I have an ethical duty and

25 obligation with regard to attorney/client confidentiality

1    which I believe is more broad than any discussions that we

2    have had.  And so to the extent that any information

3    relating to my representation of Mr. Morales is not

4    properly something that I should speak about absent a

5    court order.

6              THE COURT:  With the consent of Mr. Morales.

7              THE DEFENDANT:  The consent for Mr. Morales I

8    understand to be with regard to attorney/client privileged

9    communications.  There's something broader than that with

10   respect to confidentiality irrespective of where that

11   information came from, whether or not it was from him or

12   not.

13             THE COURT:  I'm not quite sure I know what you

14   mean.

15             THE WITNESS:  Well, in terms of -- excluding

16   what any communications that my client and I have had,

17   there may be other matters that pertain to his

18   representation that still need to be maintained

19   confidential.  I don't believe that he has or a client has

20   the right -- while they certainly have the right to waive

21   all attorney/client communication privileges, I still have

22   an obligation under the rules to not discuss his case,

23   even other aspects of his case, facts about his case that

24   maybe he didn't tell me, but that I have learned

25   throughout the course of --

22

1          THE COURT:  Let's see what the question is and

2     see whether we have any issue at all.  As I said, if I

3     understand what Mr. Proctor is saying, he's saying that

4     his client is not waiving attorney/client privilege with

5     respect to communication between the two of these people

6     and I'm not quite sure what the implications of that are

7     in terms of how much testimony you can get out of this

8     gentleman.

9          MR. PROCTOR:  Yes, sir.  And we will if it comes

10    up and, you know, if the Court finds it's a properly

11    privileged question, we want the answer to it.

12         BY MR. PROCTOR:

13    Q     But my question was I believe do you recall

14    being contacted with regard to representing Mr. Morales in

15    August of 2008?

16    A     I was hired in 2008 August.

17    Q     And that was for a state case at that time?

18    A     I don't believe it was a state case.

19    Q     It was always federal while you were in it?

20    A     I don't believe that he went to the county jail.

21    I think that he went to the Lavia Detention Center.  Lavia

22    Detention Center in our county is where federally charged

23    defendants go.  And in all honesty, I had not ever heard

24    your name until 3:25 on Wednesday.  So you're asking me

25    questions about things that happened five years ago.  I

```
 1    don't know that at the time of Mr. Morales' arrest, it was

 2    not going to be considered federal from the get-go.  I

 3    think he was arrested with more than six kilos of cocaine

 4    which subjects him to the statutory mandatory minimums.  I

 5    don't think our local county police would have presumed

 6    that it was going to be a state case.  I think D.E.A.

 7    would have taken it.  But I don't know.

 8         Q    And do you recall -- you met with Mr. Morales.

 9    Right?

10         A    Yes.  Of course.

11         Q    And without saying what you said, more than

12    once?

13         A    Yes.

14         Q    And Ms. Ferko, she's the Assistant -- for the

15    benefit of the court reporter, F-E-R-K-O.  She's the

16    Assistant United States Attorney, is she not?

17         A    She is.

18         Q    Who prosecuted Mr. Morales?

19         A    Correct.

20         Q    And you talked to her?

21         A    Correct.

22         Q    Is that fair to say?  Special Agent Huling?

23    H-U-L-I-N-G.

24         A    Correct.

25         Q    Do you know him?
```

1      A     I think his first name is Garrett.

2      Q     Had cases with him before?

3      A     I think so.

4      Q     And there came a time when Mr. Morales sat down

5  with the agent and Ms. Ferko and others.  Do you recall

6  that?

7      A     When I was present, yes.

8      Q     And there was a Mike Snyder there.  Who is Mike

9  Snyder?

10     A     I don't know.

11     Q     So what is the practice in your district with

12  regard to -- well, first of all, let me ask a better

13  question.  Do you know what a proffer letter is?

14     A     Yes.

15     Q     What is your understanding of what a proffer

16  letter is?

17     A     Well, depending on where you are, some

18  jurisdictions call them queen for a day.  We don't

19  necessarily use that.  But I have a prosecutor from

20  Washington, D.C. that I'm working with that insists on

21  using queen for a day terminology.  But in essence, there

22  is a document that is negotiated between the defense and

23  the prosecution with regard to possibly working out some

24  sort of plea agreement and, you know, certain things may

25  or may not come in later on.  And there might be some

1       Castigar issues that have to be waived.  But obviously,

2       they're different from jurisdiction to jurisdiction.

3            Q    Well, I'm talking specifically in your

4       jurisdiction.  Is there a typical proffer letter or do

5       they vary widely?

6            A    Well, I think that the -- I don't remember who

7       the U.S. Attorney was at the time.  Currently, the

8       administrator there is a gentleman named Terry Leonard.

9       I'm not certain if he allows his AUSAs some flexibility in

10      using idiosyncratic means at that time in '08.  I'm not

11      sure if it was Mr. Leonard.  So I would suspect that

12      Ms. Ferko probably used probably a typical boilerplate

13      with McAllen individuals.

14           Q    And what rights on a -- someone talking with the

15      government does a boilerplate proffer confer upon them?

16           A    I would have liked to have had a chance to look

17      at my files a little bit before I came up here today.

18      But --

19           Q    Didn't we ask and you said you had your files?

20           A    You sure did and we can get into that later if

21      you'd like.  From my recollection, they are typically

22      short.  Even our plea agreements in the McAllen division

23      are usually one page.  They're not very lengthy.  I think

24      a typical proffer letter in the -- to the extent that we

25      can call it a typical proffer letter in the McAllen

DIRECT EXAMINATION OF JARVIS

1   division would probably have the issues of independent

2   corroboration, some Castigar issues with regard to

3   information still being able to be used derivatively.  You

4   know, just probably what -- my understanding is that you

5   have the typical one in your possession.  So if you'd like

6   to show it to me --

7        Q    I only have a typical Maryland one.  I have yet

8   to see one from Texas.

9        A    Okay.

10       Q    And what protection is there for a defendant

11  other than for the statements he makes himself or herself?

12       A    Well, I think obviously, when you ask what are

13  the protections, I mean to the extent that he's truthful,

14  he is protected from having that information strictly used

15  against him in a subsequent proceeding or typically in

16  that proceeding.

17       Q    Okay.  And if he's not truthful?

18       A    Then it gets torn up, so to speak.  He doesn't

19  enjoy the benefits of the protection.

20       Q    So August 27, 2008, were you present at a

21  proffer?

22       A    I don't have that date, but if there's a

23  document that says that that's where I was, yes.  I

24  remember we had one.  If it was the 27th or the 28th or

25  the 29th, I couldn't tell you.  But if there's a report

1     that says 27th, then I was present.  I wouldn't quarrel

2     with that.

3          Q    It's my understanding.  There were two.  There

4     was one on the 27th and then the following day, Assistant

5     United States Attorneys from Maryland flew down on the

6     28th.  Does that sound correct?

7          A    If those are the dates.  I mean I remember, I

8     remember some -- I remember that happening.  But again if

9     you tell me it was the -- I'm not going to testify that I

10    remember it was the 26th versus the 27th versus the 28th.

11         Q    It was five years ago.  I'm not asking that.

12    Did you prior to this meeting ask for a proffer letter?

13         A    Yes.  And this is something that I wanted to get

14    Judge Titus to either order that I discuss because I think

15    we're getting into those issues that I do not want to

16    subject myself to disciplinary proceedings later on about

17    discussing a client's case openly.  So --

18              THE COURT:  Repeat your question, Mr. Proctor.

19              BY MR. PROCTOR:

20         Q    Well, let me ask a better one.  Did you ask

21    Ms. Ferko or anyone associated with the United States

22    Attorney's Office for a proffer letter for Mr. Morales?

23         A    There was a discussion about it.

24         Q    Okay.  Can you go into that please?

25         A    I don't think I can.  No, sir.  Unless I'm

1    ordered by the Court.

2              MR. PROCTOR:  Judge, could you ask the witness

3    to answer the question?

4              THE COURT:  If we're talking about a discussion

5    that he had with the U.S. Attorney's Office about a

6    proffer letter, I will instruct him to answer.

7              MR. PROCTOR:  Thank you.

8              THE WITNESS:  With regard to -- and again my

9    dates may be off, but what I can recall is that when we

10   went to the preliminary examination detention hearing,

11   Ms. Ferko approached me and as I'm sure you're aware of

12   the facts, prior -- well, at the time Mr. Morales was

13   arrested, he made some statements.  Afterwards he made

14   some statements.  And I'm not exactly sure how much time

15   elapsed from the time of his arrest to the time of my

16   hiring.  But he did make statements prior to obtaining

17   counsel.  And from what I remember, Ms. Ferko approached

18   me at the preliminary examination detention hearing and

19   said something like by the way, your guy -- again, this

20   was done by typical practice.  At the preliminary

21   examination detention hearing, we are given the pretrial

22   service reports which will have the rudimentary

23   information, the basic stuff and then it will have the

24   criminal history, the assessment of factors of

25   nonappearance, danger to the community, that sort of

DIRECT EXAMINATION OF JARVIS

1    thing.  And I remember she said look at your client's

2    criminal history sheet.  It's -- I don't remember the

3    numbers.  It was fifty some items long, three pages that

4    had to be stapled to back.  She said obviously, being he's

5    not getting a bond and we know about the corrupt lawyer in

6    Maryland and he has given us so much she said B.S. or

7    something like that or garbage or B.S., that we are not

8    willing to work with him.  So don't even think about it.

9    So that's my initial discussion with her if you want to

10    talk about a proffer letter.

11        Q    Okay.  So but she was willing to work with him,

12    right, because she sat down with him later?

13        A    I was able to convince her to.  Yes, sir.

14        Q    And did you ask her and insist on a proffer

15    letter for that meeting?

16        A    I asked her later.  I don't know if was it the

17    next day.  Again the timeline is skewed.  But it was

18    probably when she mentioned to me about the corrupt lawyer

19    in Maryland, that was something that I was unfamiliar with

20    and so I went back and spoke to Mr. Morales and we had

21    discussions and then I went back to Ms. Ferko.  But again

22    that's something that I'm not sure that we can clearly get

23    into absent some violations.

24        Q    Okay.  I believe you said yes when I asked if

25    you asked for a proffer letter.  You did ask for one.

DIRECT EXAMINATION OF JARVIS

1    Right?

2         A    I don't think I said that.  I don't think I

3    testified to that.

4         Q    Prior to the meeting on August 27th or you don't

5    recall the exact date.  But late August 27, 2008, did you

6    ask for a proffer letter from the government?

7         A    We had discussions about what Mr. Morales could

8    do for himself.  In those discussions, my recollection is

9    that Ms. Ferko said something along the lines of and don't

10   even think that we're going to give you a deal.  He needs

11   to give us something we can work with.  And go back and

12   talk to your client.  Again, and I'm paraphrasing and I

13   don't have that recollection.

14        Q    I'm not asking for a deal.  I'm asking was the

15   subject of a proffer discussed.

16        A    I truthfully can't remember.  If it was, she

17   would have told me hell no.

18        Q    Well, you're surmising she would have told you

19   that.  You don't know.  Right?

20        A    I don't recall.

21        Q    I looked you up on PACER.  You've had 60 or 70

22   federal cases over the years.  Does that sound about

23   right?

24        A    If you counted them.

25        Q    And of those 60 or 70 clients, I'm sure many

1    have cooperated, right, or tried to?

2         A    That's probably true.

3         Q    And of those clients that cooperated or tried

4    to, almost all of them had a proffer letter.  Right?

5         A    Not really.

6         Q    No?

7         A    I've gotten 5K1's without a proffer letter, sir.

8         Q    Why wouldn't someone ask for a proffer letter?

9         A    Are you going to ask that generally global

10   question, why wouldn't someone ask?

11        Q    Why wouldn't you want one?

12        A    Well, you would always want one.  In fact let me

13   back track.  Would you always want one, I'm not sure.  I

14   think that your notion of failing to have a proffer letter

15   by definition something that is erroneous or incompetent,

16   I take issue with that.  I don't think that that is

17   accurate.  I think there is a prominent lawyer here in

18   Maryland, that Robert Hasbib, something, that has written

19   about the pitfalls of proffer agreements.  If I can

20   recall -- and again I haven't had much time to prepare for

21   today.  But from the top of my head, I think that there is

22   quite a bit of literature that discusses that sometimes

23   the Federal Rules, specifically 410, sometimes offer a

24   defendant more protection than some proffer letters do.

25             So your question to me of why wouldn't somebody

1    ask for a proffer letter, I think has some implications

2    that or something that I don't agree with.

3         Q    Well, let me ask a better question.  Is it your

4    standard practice to request one when you take a client in

5    to talk to the government?

6         A    I take every case on a case-by-case basis.

7    There's no standard way to do things.

8              MR. PROCTOR:  Can I have a second please, judge?

9              THE COURT:  Yes.

10             (Counsel conferred with his client.)

11             BY MR. PROCTOR:

12        Q    Okay.  While the proffer letter may not be

13   perfect, without a proffer letter, he's essentially

14   confessing.  Right?

15        A    He's confessing again?

16        Q    Well --

17        A    He had already confessed.

18        Q    You went into a lot more detail at the two

19   meetings.  You talked about things that were never

20   talked -- Rob Long never came up when he was arrested to

21   the best of your knowledge, did it?

22        A    To the best of my knowledge, it did not.  I

23   obviously wasn't there, as you know, when he was arrested.

24        Q    You're aware we're here because we start trial

25   on Tuesday for the murder of Robert Long and that man is

1    charged with it.

2        A    I didn't know that until you subpoenaed me two

3    days ago.

4        Q    Well, if you had returned my calls, you might

5    not have been here.

6             THE COURT:  Mr. Proctor, don't argue with the

7    witness.  Ask him a question.

8             THE WITNESS:  I had never heard of you until

9    3:25 on Wednesday.  I know you think you're famous, but I

10   had never heard of you.

11            BY MR. PROCTOR:

12       Q    Check your cell phone messages.

13       A    Well, can't tell you -- can't tell you why I

14   never heard of you, but I haven't.

15       Q    So do you recall the topic of Robert Long coming

16   up at the proffers?

17       A    Not right now.

18       Q    Do you recall the lawyer you mentioned whose

19   name is Stanley Needleman and that's all public record

20   being implicated in a murder?

21       A    I remember.  Yes.  Like I said, it was five

22   years ago, but yes.

23       Q    And to the best of your knowledge, that had

24   never come up before, had it?

25       A    When he was arrested, did he say Stanley had

DIRECT EXAMINATION OF JARVIS

```
 1    something to do with the murder, I don't think so.
 2         Q    And you recall Maryland being sufficiently
 3    interested that two Assistant United States Attorneys
 4    Office flew down for the proffer?
 5         A    I do recall that.  Yes.
 6         Q    And a Maryland agent flew down as well?
 7         A    That is true.
 8         Q    And all of this was made without the benefit of
 9    a proffer letter, wasn't it?
10              MS. WILKINSON:  I just object to the leading
11    nature.
12              THE WITNESS:  I --
13              THE COURT:  Hold, hold.  Sir, don't talk.
14              MS. WILKINSON:  Just to the leading nature of
15    the question.
16              THE COURT:  Stop leading him and ask him a new
17    question.
18              MR. PROCTOR:  Okay.
19              THE COURT:  Sustained.
20              MR. PROCTOR:  Can I have another second?
21              THE COURT:  You may.
22              (Counsel conferred with his client.)
23              BY MR. PROCTOR:
24         Q    And without a proffer letter, were there any
25    protections Mr. Morales was given in the room that day?
```

1          A     Were there any protections he was given in the
2     room?  I mean again I don't know that I can tell you what
3     he and I discussed.
4          Q     About the use of his statements.  Were his
5     statements protected in any way to your knowledge?
6          A     I can't tell you what he and I discussed, sir.
7          Q     I'm not asking what you discussed -- let me step
8     back a minute.  You know what Miranda is.  Right?
9          A     Yes, sir.
10         Q     Did anyone read him his Miranda rights that day?
11         A     The day that we debriefed?
12         Q     Yes.
13         A     I couldn't remember.  But again, I can't tell
14    you what he and I discussed.  Even if they were -- I don't
15    remember if they were.  But he and I would have had
16    discussions.
17         Q     Okay.  And I'm not asking what you discussed,
18    but what is your understanding of everything he said that
19    day.  Did he have any protections for it at all?
20         A     Did he have any protections?  I think that he
21    did.
22         Q     What were those?
23         A     As long as he was truthful, he was going to be
24    protected.
25         Q     Where was that reduced to writing?

DIRECT EXAMINATION OF JARVIS

1        A    I don't know.

2        Q    If I brought Ms. Ferko up here, if she want to

3   say if he told us the truth, we never would have used it?

4        A    I can't tell you what Ms. Ferko would say.  You

5   should know that.

6        Q    Could Ms. Ferko bind the United States

7   Attorney's Office for the District of Maryland so that

8   they wouldn't use it?

9        A    Say that again.

10        Q    Can a prosecutor in Texas bind the United States

11   Attorney's Office in Maryland not to use a statement given

12   without the benefit of a proffer letter?

13        A    I don't know.

14        Q    Yes, you do.

15             MR. CLARKE:  Objection.

16             THE COURT:  Sustained.

17             MR. PROCTOR:  That's all I have.

18             THE COURT:  All right.  Cross-examination.

19             MS. WILKINSON:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21             BY MS. WILKINSON:

22        Q    Mr. Jarvis, would it help you to refresh your

23   recollection to look at the docket sheet in this matter in

24   terms of the dates and that sort of thing?

25        A    Sure.

CROSS-EXAMINATION OF JARVIS

1     MS. WILKINSON:  If I might mark as Government's

2  Exhibit 1, Your Honor?

3     THE COURT:  You may.

4     BY MS. WILKINSON:

5  Q    I'm going to give you a copy of the docket

6  sheet.  And take a minute to look at it and put your mind

7  back to what happened in August of 2008.  And would it

8  also refresh your recollection to look at Mr. Morales'

9  confession about what he was facing prior to coming into

10  the U.S. Attorney's Office for his debriefing?

11  A    It would.  Yes, ma'am.

12     MS. WILKINSON:  Marking for identification, Your

13  Honor, Government's Exhibit 2.  I have a copy for the

14  Court, Your Honor.

15     THE COURT:  Okay.  Thank you.

16     THE WITNESS:  Thank you.

17     BY MS. WILKINSON:

18  Q    So Government's Exhibit 1 for the record is just

19  a docket sheet off of PACER and Government's Exhibit 2 is

20  a series of paperwork related to the complaint,

21  Mr. Morales' Miranda in Texas and the statement he gave at

22  the time he was arrested.  Do you see that there?

23  A    Yes, ma'am.

24  Q    Okay.  So let's go back to the time that you

25  were retained by Mr. Morales to represent him.  Just

1    putting in context, when did you enter your appearance in

2    Texas, Mr. Jarvis?

3        A    I believe here according to the docket sheet, it

4    was August 21st.

5        Q    August 21, 2008.  And I presume that you had

6    already met with Mr. Morales and you came into enter your

7    appearance officially for him on that day.  Is that

8    correct?

9        A    That is correct.  Yes, ma'am.

10       Q    Again refreshing your recollection with the

11   paperwork, can you tell for the record, when Mr. Morales

12   was arrested?

13       A    It appears that he was arrested on -- well, the

14   Attachment A says August 15, 2008 at approximately 3 p.m.

15       Q    Okay.  Now I assume prior to August 15, 2008,

16   you had never heard of Jose Morales?

17       A    That is true.

18       Q    So the timeframe that we're now dealing with

19   sometime after August 15, 2008 and up to the time you

20   entered your appearance and then continuing after with the

21   debriefing.  Is that fair to say?

22       A    That is.  Yes, ma'am.

23       Q    And did there come a time when and just to kind

24   of close the loop, Mr. Jarvis, when you were fired by

25   Mr. Morales or let go, so to speak?

1       A    Yes, ma'am.  And I see here on the docket sheet

2   that I filed a motion to withdraw on September 15, 2008

3   and so that means it would have been prior to me filing

4   that.  So I probably represented him for a couple of

5   weeks.

6       Q    So a couple of weeks later that he had new

7   counsel retained for himself.  Correct?

8       A    Yes, ma'am.

9       Q    So let's go back.  When you go enter your

10  appearance in federal court, did the prosecutor provide

11  you a copy of Mr. Morales' complaint and the Miranda

12  statement that he had made?

13      A    I'm sure she did.  I don't specifically -- I

14  don't specifically remember, but I recognize these

15  documents.  So I'm sure she did.  Yes.

16      Q    So you had known at some point that Mr. Morales

17  had already received this Miranda warnings and had

18  provided a significant eye opening statement, if you will,

19  with regard to his own culpability and the culpability of

20  an attorney here in Maryland.  Correct?

21      A    I knew that.  Yes, ma'am.

22      Q    So if we look at the actual statement itself,

23  Mr. Morales confessed on August 14th to his name, his

24  address, obviously that.  And the first sentence he states

25  is that "last week, I flew down under the directions of my

1     attorney, Stanley Needleman, to meet with a male subject
2     known to me as Raoul to set up the transportation of ten
3     kilograms of cocaine from the Rio Grande Valley to
4     Baltimore, Maryland with a possibility of 30 kilos in the
5     near future."  Have I read that right?
6          A     Yes, ma'am.
7          Q     So it goes on to talk about Mr. Morales'
8     involvement in drug trafficking which frankly doesn't
9     sound, Mr. Jarvis, would you agree with me is not all that
10    significant?
11         A     The six to ten kilos?
12         Q     As a routine drug case in McAllen?
13         A     I have had cocaine cases much larger.  Yes.
14         Q     So right now, we're looking at the information
15    that Mr. Morales provided and the interest, if you will,
16    is the fact that it was an attorney up here in Baltimore
17    who was involved in drug trafficking, that fact was not
18    routine or usual.  Would you agree with me?
19         A     I would agree that that's what would jump out.
20    Yes, ma'am.
21         Q     So going back to the docket sheet, when exactly
22    did you have the detention hearing for Mr. Morales?
23         A     That would be -- I believe it was 8-21-08.
24         Q     And on that 8-21-08, is that the -- had
25    Mr. Morales received his initial appearance?

CROSS-EXAMINATION OF JARVIS

1    A    Yes.

2    Q    Okay.  And at his initial --

3    A    That it would have been a few days before.

4    Q    Right.  A few days before.  And at his initial

5    appearance, at that time based on your training and

6    experience as a lawyer, had Mr. Morales been in front of a

7    United States magistrate judge?

8    A    Yes, ma'am.  It indicates here he was in front

9    of --

10   Q    Had you represented clients in initial

11   appearances before a United States magistrate judge in

12   Texas?

13   A    Yes.  But it's usually pretty quickly after

14   you're hired.  It happens quickly.  But yes.

15   Q    During that initial appearance proceeding, is it

16   the practice of a United States magistrate and you can

17   look at the docket sheet to refresh your recollection, to

18   further advise the defendant of his rights?

19   A    They are advised.  Yes, ma'am.

20   Q    And do those rights include the right to an

21   attorney?

22   A    Yes, ma'am.

23   Q    And do those rights include the right to remain

24   silent?

25   A    Yes, ma'am.

1      Q      And do those rights include the fact that what
2  you say may be used against you?
3      A      Yes, ma'am.
4      Q      And that's all told to a defendant by someone
5  sitting on a bench like Judge Titus here in open court?
6      A      It is.
7      Q      So now this would be, count with me, the second
8  time that Mr. Morales was advised of his rights.  Correct?
9      A      That would be.  Yes, ma'am.
10     Q      Now you at that time you testified on direct
11  that you had a conversation with Ms. Ferko during the
12  detention hearing.  Correct?
13     A      Prior to.  Yes.
14     Q      And at that time she advised you of the pretrial
15  report I guess --
16     A      Presentence report.
17     Q      Exactly.  About his criminal history.  Correct?
18     A      Yes, ma'am.
19     Q      And Mr. Morales was no stranger to the criminal
20  justice system?
21     A      It did not appear so.
22     Q      And is it fair to say that he had been arrested
23  many times?
24     A      That is true.
25     Q      And Ms. Ferko was drawing that to your attention

1    because in her view this wasn't going to be a bond case.

2    Correct?

3         A    That is correct.  It would have been a

4    presumption case anyway.  But right.

5         Q    And we knew already at this point, did we not,

6    Mr. Jarvis, that Mr. Morales had been arrested in a prior

7    private airport?  Yes?

8         A    Correct.

9         Q    Charter a plane back to Baltimore?  Yes?

10        A    Yes.

11        Q    With a large amount of cash?  Yes?

12        A    Yes, ma'am.

13        Q    With six kilograms of cocaine and a bag in the

14   bathroom?

15        A    That is true.

16        Q    And in your training and experience as a defense

17   attorney down in Texas, Mr. Morales with his criminal

18   history, a confession that had been Mirandized and the

19   significance of the evidence, he was in a lot of trouble.

20   Correct?

21        A    He was facing an uphill battle.  Absolutely.

22        Q    And as a defense attorney, often when there is

23   something unusual, information that a defendant can

24   provide such as a corrupt attorney, that is something that

25   a defendant might be able to do to help himself out of his

1    predicament.  Correct?

2         A    That is true.

3         Q    And it's fair to say -- I'm not asking you now,

4    although perhaps I think it's relevant to this inquiry,

5    but Mr. Miranda wanted to help himself out of his

6    predicament?  Yes?

7         A    That was the plan.  Yes, ma'am.

8         Q    And in fact, Ms. Ferko told you she wasn't

9    really interested in anything that he had to say.  But do

10   you recall that perhaps people in Maryland might be?

11        A    Yes, ma'am.

12        Q    And is that in fact the reason why some

13   Assistant U.S. Attorneys and agents from Baltimore flew

14   down for that debriefing?

15        A    That would be true.

16        Q    And is it fair to say that Ms. Ferko, and I am

17   asking your best recollection, might have said words like

18   I really don't care what Mr. Morales has to say, this is a

19   routine drug case, but if he can help himself out with

20   these attorneys, bring him in?

21        A    And she probably threw in an expletive, but yes.

22        Q    And Mr. Morales wanted to help himself out of

23   this predicament, let there be no mistake about that.

24   Correct, Mr. Jarvis?

25        A    That is correct.

CROSS-EXAMINATION OF JARVIS

1    Q    So when you bring a client in whether or not

2    it's with a proffer agreement or not for a debriefing, do

3    you advise them generally, it's not a good idea to lie to

4    the government?

5              MR. ZUCKER:  Objection.  Relevance.

6              THE WITNESS:  I always tell them that.

7              BY MS. WILKINSON:

8    Q    I'm sorry.  I didn't hear you.

9              MR. ZUCKER:  Objection.

10             THE WITNESS:  I always tell them that.

11             THE COURT:  I can't hear what the witness is

12   saying.  Say it again, sir.

13             THE WITNESS:  I always tell them to be truthful.

14   Yes, ma'am.

15             THE COURT:  Okay.

16             BY MS. WILKINSON:

17   Q    And when you tell them to be truthful, is the

18   reason for that because if they lie, whether or not they

19   have a proffer agreement, all bets are off with the

20   government?

21   A    Absolutely.

22   Q    They ruin their credibility.

23   A    They can.

24   Q    And in this case we're dealing with him

25   testifying possibly against a lawyer in Baltimore.  Yes?

1     A    Correct.

2     Q    And would you agree with me the stakes are even

3    higher to be truthful?

4     A    Absolutely.

5     Q    So we go to -- we go to the detention hearing.

6    We have conversations I believe you testified on direct

7    back and forth with Mr. Morales and the decision is made

8    that Mr. Morales is competent for his debriefing.

9    Correct?

10     A    Yes, ma'am.

11     Q    And you mentioned on direct that you recall him

12    talking about a murder during his debriefing.  Yes?

13     A    Yes, ma'am.

14     Q    And in that murder -- I know you haven't had

15    much chance to prepare today -- Mr. Morales was not saying

16    that he was involved in the murder, was he?

17     A    No, ma'am, he did not.

18     Q    Mr. Morales was putting Mr. Needleman in a

19    murder.  Correct?

20     A    Correct.

21     Q    So at the time Mr. Morales was giving his

22    debriefing, it was to talk about someone else being

23    involved in a murder.  Correct?

24     A    He never said he was involved in the murder.

25     Q    And when he was first interviewed by I.C.E. on

1    August 14, 2008, the attorney he spoke about was Stanley

2    Needleman.  Correct?

3         A    True.

4         Q    And the attorney that was involved in the murder

5    that he told the police about was Stanley Needleman.

6    Correct?

7         A    True.

8         Q    He didn't put himself in that.  Correct?

9         A    Correct.

10        Q    Now the debriefings that happened over a period

11   of time, they were with yourself.  Correct?

12        A    Yes, ma'am.

13        Q    Federal agents.  Correct?

14        A    Yes, ma'am.

15        Q    Ms. Ferko.  Correct?

16        A    Yes, ma'am.

17        Q    Some Assistant U.S. Attorneys from Maryland.

18   Correct?

19        A    Yes, ma'am.

20        Q    At periods of time.  Yes?

21        A    I think that's right.  Yes.

22        Q    And during all that time, did anybody hurt or

23   touch Mr. Morales?

24        A    No, ma'am.

25        Q    Did anybody threaten him?

1     A     No, ma'am.

2     Q     Did anybody say Mr. Morales, you have to tell us

3   this or, you know, we're going to put you in solitary

4   confinement?

5     A     No, ma'am.

6     Q     Did they threaten him, intimidate him in any

7   way?

8     A     They never threatened him.

9     Q     Why don't you give the judge your best

10  recollection of how Mr. Morales' demeanor was in the

11  course of these debriefings?

12    A     Mr. Morales is actually a highly intelligent

13  individual.  I would say in terms of my clients, he's at

14  the top in terms of intellectual capability.  He's a sharp

15  individual.  I didn't understand him to be threatened or

16  felt threatened or scared.  He was certainly facing some

17  serious charges.  But based on our conversations, I didn't

18  interpret his demeanor to be that of someone who is

19  frightened beyond obviously being charged with a crime.

20    Q     Is it fair to say they didn't have to pull very

21  many teeth, so to speak, to get Mr. Morales to talk about

22  Mr. Needleman?

23    A     That's fair.

24    Q     He was there to talk about Mr. Needleman?

25    A     Correct.

CROSS-EXAMINATION OF JARVIS

1     Q    In fact Mr. Needleman's name was mentioned many

2   times in that debriefing.  Yes?

3     A    True.

4     Q    That was the purpose of the debriefing so

5   Mr. Morales could rat on his lawyer.  Yes?

6     A    So he could provide information that would be

7   helpful to the government.

8     Q    With the expectation that it might help him out

9   of the predicament that he was in.  Yes?

10    A    Absolutely.

11    Q    And again you had talked on direct with Mr.

12  Proctor about what the practice is down in Texas if

13  Mr. Morales would be able to provide such important

14  information in a case that could, you know, make a dirty

15  lawyer stand trial for very significant drug charges.  And

16  in your opinion, Mr. Jarvis, if Mr. Morales had been

17  truthful during those proceedings, if he had helped and

18  told the truth about Mr. Needleman, would Ms. Ferko have

19  worked out a 5K with you?

20    A    I would have no doubt in my mind.

21         MR. ZUCKER:  Objection.

22         THE COURT:  Overruled.

23         BY MS. WILKINSON:

24    Q    Yes?

25    A    I have no doubt in my mind.

1    Q    But he didn't.  He lied.  Correct?

2         MR. ZUCKER:  Objection.  Asking this witness to

3    comment on another witness' credibility.

4         THE COURT:  Sustained.

5         MS. WILKINSON:  Withdrawn, Your Honor.

6         BY MS. WILKINSON:

7    Q    I'll ask it this way.  Is it fair to say you

8    were told that the agents and the prosecutors did not

9    believe Mr. Morales?

10   A    I need to be clear.  I was fired probably prior

11   to them coming to whatever conclusions they had.

12   Q    Very well.  Let me ask you this.  In the time

13   that you've prepared your -- that you were subpoenaed to

14   come here to court today, have you had the chance to

15   review Mr. Morales' own statements about his debriefings

16   during his sentencing hearing in front of the judge down

17   in McAllen, Texas?  Have you reviewed those?

18   A    Yes, ma'am.

19   Q    And did you see in those admissions that

20   Mr. Morales made --

21        MR. PROCTOR:  Judge, we would object.  If Ms.

22   Wilkinson wants to admit the --

23        THE COURT:  Overruled.  It's fair

24   cross-examination.

25        BY MS. WILKINSON:

1       Q    Is it fair to say, Mr. Jarvis, that Mr. --

2   according to the transcript that Mr. Morales told the

3   court in Texas, yes, "I told her everything" -- meaning

4   the AUSA -- "I did tell some lies in the beginning with my

5   first attorney who gave me some very bad advice.  The

6   Court:  Uh-huh.  The defendant:  And he told me to make up

7   a story, a big story if I wanted a bail and that's what I

8   did."  Did you read that in the transcript, Mr. Jarvis?

9       A    I did read that.  Yes, ma'am.

10      Q    So I have to ask you.  Did you tell Mr. Morales

11  to make up a big story?

12      A    No, ma'am.

13      Q    Did you tell him if he made a big story, he

14  would get out on bail?

15      A    No, ma'am.

16      Q    Did you tell Mr. Morales that if he told a big

17  whopper about his lawyer, that he would be able to walk

18  out of prison that day?

19      A    Of course not.

20      Q    Did you tell him not to lie?

21      A    I sure did.

22          MS. WILKINSON:  I'm just checking my notes, Your

23  Honor.

24          BY MS. WILKINSON:

25      Q    Is it your understanding Mr. Morales didn't get

REDIRECT EXAMINATION OF JARVIS

1    a 5K, Mr. Jarvis?

2        A    It's my understanding the he did not.

3        Q    So the only issue with respect for the court to

4    resolve was whether or not Mr. Morales was a career

5    offender?

6        A    I didn't read that far into his sentencing

7    transcript.

8            MS. WILKINSON:  Okay.  Fair enough.

9            THE COURT:  Any redirect?

10                   REDIRECT EXAMINATION

11           BY MR. PROCTOR:

12       Q    I just want to make sure the record is clear.

13   As well as receiving a subpoena for your presence, you

14   received a subpoena duces tecum to bring your file.  Isn't

15   that correct?

16       A    That is true.

17       Q    And do you have one?

18       A    I do not.

19       Q    Neither electronically nor paper?

20       A    No, sir.

21       Q    Is there any reason for that?

22       A    Yes.

23       Q    Do you shred them?  Do you give them to the next

24   attorney?  Why don't you have one I guess is my question.

25       A    Say that last part.

1    Q    Why don't you have a file?

2    A    When I'm looking at these dates, what I am

3    piecing together is he was arrested, Mr. Morales was

4    arrested the middle of August 2008.  My former law partner

5    and I divorced, so to speak, August 1, 2008.  And in that

6    divorce, he got the building and the secretaries and the

7    computers.  So I'm piecing things together.  I think that

8    probably what would have happened is this was the time

9    that I was moving offices.  I was retained for less than

10   two weeks.  I just -- I don't know.

11        When I got your subpoena, I did drive to my

12   warehouse where I keep boxes of closed files so that I

13   could testify that I did look for it.  I didn't find one.

14   So I'm presuming that after a two-week representation, the

15   file might have been thin in terms of not being as

16   voluminous as other files that we close out and maybe just

17   got -- failed to be filed or closed out.  There weren't in

18   any of the closed out files.

19   Q    Now Ms. Wilkinson showed you the statement that

20   Mr. Morales made, but didn't sign.  Do you still have it

21   up there, sir?

22   A    I do, yes.  Yes, sir.

23   Q    And at the top, it says Hidalgo County Sheriff's

24   Office.  Right?

25   A    It does.

REDIRECT EXAMINATION OF JARVIS

1    Q    So does that indicate to you that it started off

2    as a state case?

3        A    Not really.  I mean the Hidalgo County Sheriff's

4    office has a what we call a High Intensity Drug

5    Trafficking, you know.  Obviously, there is a county or

6    state component to it.  Very oftentimes in our

7    jurisdiction a local police officer may make a routine

8    stop and find significant amount of marijuana or cocaine

9    in the car.  Just because it was an initial stop made by a

10   local or municipal non-federal agency doesn't mean that

11   they get to keep the case.

12            And so I don't know what the inter-agency

13   agreements are.  I don't know if there's a threshold

14   amount in terms of money or narcotics.  But it is often

15   the case that in seizures in our jurisdiction, that it is

16   not strictly a federal arrest.  There might be different

17   agencies involved.  But I just don't think that anybody

18   that practices in our jurisdiction would expect that a

19   six-kilogram of cocaine case at a private airport would

20   have been a local crime.

21       Q    And would you agree with me and take a moment

22   and read that statement if you need to, there was no

23   mention of the murder of Robert Long in Mr. Morales'

24   initial statement?

25       A    That is true.

1    Q    There is no mention of a murder of anyone, is

2    there?

3    A    That is true.

4    Q    Now this meeting that happened and you don't

5    recall the exact date, but the end of August or the two

6    meetings at the end of August, where were they?

7    A    They were on the sixth floor of the Benson Tower

8    which is where we have our federal courts and the United

9    State's Attorney's Office.

10   Q    Is the sixth floor occupied by the U.S.

11   Attorney's Office?

12   A    It is.

13   Q    And so it's at the U.S. Attorney's Office.  And

14   to the best of your recollection, were you there

15   throughout?

16   A    I believe so.  Yes, sir.

17   Q    And was there a time you were present by

18   telephone only?

19   A    If it is documented as such, then that may be

20   true.

21   Q    I don't believe it's documented either way.  I'm

22   asking what your recollection is.

23   A    I don't know.  There have been cases where for

24   scheduling reasons, if I need to drive to another hearing,

25   I will be on my car phone and listen to it.  I don't know

1    if that happened with Mr. Morales.  But I wouldn't dispute

2    that if somebody says that necessarily.

3        Q    Okay.  And again, you don't have the benefit of

4    seeing this, but if the agents' notes that say represented

5    by Eric Jarvis and Mike Snyder, you don't know who Mike

6    Snyder is?

7        A    No, sir.

8            MR. PROCTOR:  May I have a second, please,

9    judge?

10           (Counsel conferred with his client.)

11           BY MR. PROCTOR:

12       Q    That's a good question.  When you weren't

13   available, let's say you had court or a jail visit that

14   couldn't wait, we're just trying to -- maybe it was the

15   agent wrote the name down wrong.  Was there anyone else

16   who would cover for you if a proffer had to happen and you

17   couldn't be there?

18       A    I don't believe so.

19           MR. PROCTOR:  And, judge, I guess -- can we have

20   this marked as Defendant's 1 for identification only?

21           BY MR. PROCTOR:

22       Q    I'm showing you, sir.

23           MR. PROCTOR:  Judge, I always forget.  May I

24   approach the witness, please?

25           THE COURT:  You may.

REDIRECT EXAMINATION OF JARVIS

```
1              MR. PROCTOR:  Just shout at me if I forget.
2              THE COURT:  I'm not fussy about things like
3     that.
4              BY MR. PROCTOR:
5        Q    This is the notes of the proffer that occurred.
6     Do you see the date on the top right corner, sir, as being
7     August 27th?
8        A    Yes, sir.
9        Q    And to the left underneath the word, debrief, it
10    says rep by Eric Jarvis and Mike Snyder?
11       A    Yes, sir.
12       Q    And there's a phone number listed.  Is that your
13    phone number?
14       A    That is still my phone number today.  Yes, sir.
15       Q    And the phone number listed for Mike, do you
16    recognize that phone number?
17       A    I don't.
18       Q    So but as you sit here today, you don't recall
19    one way or the other whether you were present in person or
20    present by phone.  Is that fair to say?
21       A    I remember being present in person.  I don't
22    know if I had to leave if that's somebody saying that.
23    But I remember sitting there.
24       Q    So you know you were there for at least some of
25    it.  Is that fair?
```

```
 1        A    Yes.
 2        Q    And it was a -- if I tell you it was a two-day
 3   briefing, do you know that you were there for both days
 4   for at least part of it or you just --
 5        A    I don't recall.
 6             MR. PROCTOR:  Okay.  I have --
 7             THE COURT:  All right.  The witness may step
 8   down.
 9             MR. ZUCKER:  One second, judge.  Moment to
10   consult.
11             (Counsel conferred.)
12             MS. WILKINSON:  Just to make sure the record
13   is --
14             THE COURT:  Wait.  They may have another
15   question.
16             MS. WILKINSON:  Oh, I'm sorry, Your Honor.
17             MR. PROCTOR:  That's all I have for this
18   witness.
19             THE COURT:  All right.  What did you say, Ms.
20   Wilkinson?
21                       RECROSS-EXAMINATION
22             BY MS. WILKINSON:
23        Q    Mr. Jarvis, just to clarify for the record, is
24   it fair to say you specifically recall being present for a
25   debriefing of Mr. Morales?
```

```
 1          A    Yes.
 2          Q    And at that debriefing, Mr. Morales was present?
 3   Yes?
 4          A    Yes, ma'am.
 5          Q    The Assistant U.S. Attorney Ferko?
 6          A    Yes, ma'am.
 7          Q    Did you meet the prosecutors from the U.S.
 8   Attorney's Office in Maryland?
 9          A    I think I did.  Yes.
10          Q    And the various agents that were there?
11          A    Yes, ma'am.
12          Q    And you have a recollection of that?
13          A    I do.
14               MS. WILKINSON:  Nothing further.
15               THE COURT:  All right.  The witness may step
16   down.  Thank you very much, sir.
17               THE WITNESS:  And may I be excused --
18               MR. ZUCKER:  Quick moment to consult, judge.
19                       REDIRECT EXAMINATION
20               BY MR. PROCTOR:
21          Q    Sir, could you describe the agents?  How many,
22   male, female, white, black, Hispanic?
23          A    Not right now.
24               MR. PROCTOR:  That's all I have.
25               THE COURT:  All right.  The witness may step
```

```
1    down.  You may return to Texas.
2              THE WITNESS:  Thank you very much.
3              THE COURT:  Thank you very much.
4              MR. PROCTOR:  Judge, can I just have a witness
5    voucher for the witness?  I just want to --
6              THE COURT:  Can you what?
7              MR. PROCTOR:  The witness is entitled to a
8    voucher.  I just want to talk to him for one second about
9    that.
10             THE COURT:  You may.
11             (Pause.)
12             MR. PROCTOR:  Thank you, judge.
13             THE COURT:  All right.  I'll hear argument on
14   the motion.
15             MR. PROCTOR:  Can I have a second to consult?
16             (Counsel conferred with his client.)
17             MR. PROCTOR:  I'm glad he's left the room.
18   Judge, I mean it's our position that it's per se
19   ineffective to not protect the client.  We cited a case --
20             THE COURT:  Help me out with one thing because
21   you are making an argument based on very, very, very
22   little authority that I'm aware of.
23             MR. PROCTOR:  Correct.  And I have it up on
24   the --
25             THE COURT:  Let me start with two things.  First
```

1    of all, you got Miranda.  Miranda establishes an

2    exclusionary rule which precludes the introduction of

3    evidence for the public policy reason of trying to

4    discourage or prohibit improper government conduct in

5    violation of someone's constitutional rights.  That's a

6    well-known, well established rule.  We're all familiar

7    with that.  You are trying to take a Strickland-type

8    theory to something that happened in another state, in

9    another case and say the lawyer was incompetent.

10             Now my understanding of Miranda is not that the

11   Supreme Court is saying not only do you have to advise

12   them of their right to counsel, meaning the detective, but

13   you also need to make it happen and you need to make

14   certain that the person is competent and if you don't,

15   that's government misconduct that can result in exclusion.

16   I am lost on how that can be the case.

17             Where is there misconduct in violation of

18   constitution by a government official on that side of the

19   table present in this case that would justify exclusion of

20   statements made when he was represented by counsel in

21   another proceeding in another state?  How does that get

22   back to the exclusionary rule?

23             MR. PROCTOR:  That's not what we're saying,

24   judge.  I go to trial.  My client says there are three

25   people that can tell you I was 30 miles away drinking Pina

1    Coladas at the time of the crime.  I never talked to them.

2    I never subpoenaed them.  That case would still get

3    reversed and the government didn't do a darn thing wrong.

4    They didn't know those people existed.  You have a right

5    to an attorney.  If that right is to have any teeth, your

6    attorney should be awake, seeking to enforce your right.

7              THE COURT:  Well, this is a proceeding that is

8    just beginning and we're talking about the lawyers in this

9    case.  That's you and your colleague today, Mr. Zucker.

10             MR. PROCTOR:  We are not just talking about

11   that.  We are talking about a statement the government

12   seeks to introduce that will be part and parcel of closing

13   argument --

14             THE COURT:  What prophylactic purpose is there

15   in punishing government misconduct by excluding it?  What

16   is the rationale for excluding it?

17             MR. PROCTOR:  Again, we're not looking to punish

18   the government.  We're not faulting the government.  Ms.

19   Ferko it sounds like did what she was supposed to do.  But

20   you're also charged with protecting the rights of this

21   defendant.

22             THE COURT:  But why should exclusion be the

23   appropriate remedy if any for what you're describing?

24             MR. PROCTOR:  As opposed to going up on direct

25   appeal after we have this long trial and you can't raise

1    ineffectiveness there and then we come back on 2255.  You

2    know what he's going to say.  You've already heard it.

3    That statement if it's material procured without the

4    effective assistance of counsel will just lead it to be

5    reversed --

6              THE COURT:  Well, it wasn't procured in

7    violation of his right to counsel.  The magistrate judge

8    furnished him with a lawyer.

9              MR. PROCTOR:  Without effective assistance of

10   counsel.

11             THE COURT:  Okay.  All right.  Any further

12   argument?  I'd like to hear from the government.

13             MR. PROCTOR:  No, sir.

14             THE COURT:  Okay.

15             MS. WILKINSON:  Your Honor, obviously we

16   disagree with any finding that Mr. Jarvis was incompetent.

17   He was in this case for three weeks and it's clear from

18   his cross-examination and his direct that this was a

19   client who wanted to come in and talk about Mr. Needleman.

20   He saw a window of opportunity and that's what he was

21   going to drive a truck through.  And he admitted that he

22   lied which is the most important thing at the end of the

23   day, Your Honor.

24             Because whether or not Mr. Jarvis is a potted

25   plant sitting there and he wasn't.  It's very clear that

1   he wasn't.  He's a busy practitioner in a high active drug

2   practice where he comes in and he represents some guy for

3   three weeks who has a terrible criminal history, who's

4   already confessed and now he wants to come in and talk

5   about his lawyer.

6          So Mr. Jarvis got him the opportunity to appear

7   before that AUSA, an AUSA who really wasn't interested in

8   him otherwise and let him come in and talk about that

9   lawyer.  And the statement that he gave is not true.

10         So whether or not Mr. Jarvis was -- if nobody

11  was there or if the government promised not to use

12  truthful information against him makes no difference in

13  this case.  Because at the end of the day, the analysis is

14  an easy one.  Mr. Morales told the judge that he lied in

15  those statements.  And it's the statement that he makes

16  about Mr. Needleman related to this murder that he does

17  not implicate himself in, does not implicate himself in

18  that the government seeks to use in this case.  And it's

19  very clear there's no Miranda warning at all for the

20  reasons that the Court just analyzed.

21              THE COURT:  All right.  Anything further.?

22              MR. PROCTOR:  No, sir.

23              THE COURT:  All right.  I'm going to deny the

24  motion.  First of all, I found the witness in front of me

25  to be credible.  He was given the statement made by

Mr. Morales at his sentencing about being -- allegedly

having told this witness to make up a story and denied

that.  I find that denial credible.  Any officer of the

court telling a client to make up a story is not going to

have a very long career.

It is apparent from the totality of his

testimony that Mr. Morales was very anxious to spin a tale

about misconduct by his then Maryland lawyer in order to

help him out of a great big predicament he was in.  I

don't find anything said or done by this lawyer in Texas

was below the Strickland standards of representation of

this client.  This was a client that was very articulate.

He indicated he was one of the smartest clients he had,

very much wanting to manage the ship of state in terms of

his representation.  And I don't find that there was any

deficiency in his representation.  Rather he had a client

who wanted to tell a tale and ultimately admitted at his

sentencing that he had told a tall tale and tried to put

the blame on this lawyer.  And I found this lawyer's

denial of the suggestion that he had told Mr. Morales to

make up a tall tale, I find this lawyer to be credible and

I find it incredible that this lawyer instructed him to

make up this tall tale.  So the motion is denied.

All right.  We now have -- well, the one that

may be something more significant to take on is the

1   government's motion in limine to admit deceiving

2   statements, Number 57.  Let me hear the government's

3   argument on that.

4           MS. WILKINSON:  I don't --

5           THE COURT:  I haven't seen any response to that.

6   Is there a response to that?

7           MS. WILKINSON:  Not a written response, Your

8   Honor.  And I had spoken briefly to counsel beforehand and

9   I don't know what their objection of the law is fairly

10  clear that if the Court finds that Mr. Morales was

11  involved in making sure that Mr. Long was not available as

12  a witness, that statements, relevant statements that

13  Mr. Long made are admissible --

14          THE COURT:  Assuming an adequate evidentiary

15  foundation is made at trial, I think the law you cited is

16  correct.

17          MS. WILKINSON:  Exactly, Your Honor.

18          THE COURT:  The question, of course, would be

19  whether that adequate evidentiary foundation is laid.  So

20  we'll have to cross that bridge when we get to it.  But I

21  will grant the government's motion without prejudice to

22  your right to object if you don't think the adequate

23  foundation has been laid.

24          MR. PROCTOR:  Well, yes, judge.  I guess our

25  point is and the case law says the judge doesn't have to

1    hear the testimony outside the presence of the jury.  But

2    there is certainly no reason to prohibit it.  Obviously,

3    if the government gets up in opening statement and says

4    this is what Mr. Long is going to say, you're going to

5    hear from Mr. Long, he was in a videotaped statement.  He

6    said X, Y and Z.  He was a witness.  That's why he was

7    killed.  I think is it Jiles, the Supreme Court case?  You

8    know, we can't unring that bell later.  And so best

9    practice I believe would be to put witnesses on before we

10   have opening statement so that the government can show

11   through hearsay and an agent.  And I'm not suggesting we

12   put every witness on that may have a statement to link the

13   murder, not so much the murder, but for the purpose of the

14   government demonstrating to this Court that the killing

15   was specifically designed to prevent him from testifying

16   against Mr. Morales, which is the test.  People kill

17   people for all sorts of reasons every day.  None of which

18   gets their statements in.  It has to be --

19             THE COURT:  Well, I have been painfully made

20   aware of because of all the pretrial statements in this

21   case and the statements and the documents and so forth

22   that the government's theory and they have numerous

23   witnesses I assume who will be here to demonstrate the

24   validity of this theory is that he became aware through

25   Mr. Needleman of his co-defendant cooperating and there's

1    a conflict between your client and Mr. Needleman as to

2    what was said and who said it.  But at least from the

3    standpoint of Mr. Needleman, that he was going to take

4    care of it.  And the government intends to offer evidence,

5    other evidence that shows that that's exactly what he did.

6            MR. PROCTOR:  And again, we think the Court

7    should hear it outside the presence of the jury so that it

8    can decide it.

9            THE COURT:  Well, it seems to me, it's a matter

10   of timing, not so much as outside the presence of the

11   jury.  I can't tell the government exactly how to put its

12   case on.  But it would seem to me that testimony as to the

13   statements made by Mr. Long should come a little farther

14   into the case after I've heard the other testimony that we

15   just alluded to, rather than have it outside the presence

16   of the jury.  I don't want to get this case into a

17   six-week trial.

18           MS. WILKINSON:  Your Honor, first of all, I

19   don't think that that is what is required and we would --

20   I'm not sure.  I have to look at my trial order of proof

21   whether or not we intended to call the several witnesses

22   that to whom Mr. Morales made --

23           THE COURT:  Maybe calling them a little later

24   case.  Maybe not the first week.  But the second week,

25   allow you to put on the witnesses that would set up the

1    evidentiary foundation to show that Mr. Morales was

2    intending to have that happen.  So therefore, the

3    statements by Mr. Long could come in.

4            MS. WILKINSON:  Your Honor, I do not have that

5    in our order of proof just because it doesn't make sense

6    chronologically for the jury.  And if the Court would hear

7    me out about that?  I would like to proceed by proffer

8    because it's not just Mr. Needleman who is going to

9    testify about statements that Mr. Morales made

10   incriminating himself in this murder.  There are several

11   witnesses who are going to testify about that.

12           In my experience before Judge Chasanow in the

13   Gray case as well as the other cases cited in our brief is

14   that it's not required to do it in the order that the

15   Court suggests.  That a proffer by the government with the

16   punishment that if we don't link it up and don't prove it

17   up, that all that evidence gets stricken.

18           Because Mr. Long had talked to several people

19   about his cooperation and his fears, it's kind of hard to

20   extricate it that way.  But I will proffer to the Court

21   that in addition to Mr. Needleman, Mr. Morales made

22   incriminating statements to another correctional officer

23   who's coming in to testify regarding the murder of

24   Mr. Long as well as to cooperating witnesses, inmate

25   witnesses to whom he made jailhouse conversations.  And

1    most of the trial will be made corroborating those

2    witnesses statements about what Mr. Morales said.  And I'm

3    happy to write it down for the Court before we start so

4    that you have what our purported testimony will be about

5    that.  But I don't think it's required under the law for

6    us to re-do our order of proof.

7                THE COURT:  I wasn't saying that.  I was talking

8    in terms of whether any preliminary showing needs to be

9    made outside the presence of the jury.  I'm not so sure

10   that that's required at all.

11               MS. WILKINSON:  Right.

12               THE COURT:  But to the extent that it is, it

13   could readily be solved by having some preliminary

14   testimony before you put in the statements of Mr. Long.

15               MS. WILKINSON:  I will certainly consider

16   calling one of the witnesses.  He's coming from out of

17   state.  He's the Correctional Officer Pabon --

18               THE COURT:  Well, based on the government's

19   representations in its motion as to what it intends to

20   prove, I'm going to grant the motion and allow you to

21   admit Mr. Long's statements.  But I believe in fairness to

22   the defendant, I would like to see some testimony that

23   shows the existence of a basis for this coming in before

24   Long's statements actually come in.  Not a lot.  I mean I

25   don't need to have you completely put upside down your

1    order of your proof.  And it seems to me from what you've

2    told me that it won't take too many witnesses before

3    there's an evidentiary basis for putting in Long's

4    statements based upon what you proffered to me.

5            MS. WILKINSON:  Your Honor, two comments about

6    that just to make sure I understand the Court's analysis

7    here.  We had intended to start the trial with the

8    evidence about the murder and then talk about the motive

9    behind the murder, which does include statements that

10   Mr. Long made and then our witnesses related to the

11   statements that come later.

12           I will tell you this, Your Honor.  The three

13   witnesses have all been in the grand jury and testified

14   under oath about the statements that Mr. Morales made to

15   them.  So the three witnesses have all testified.  I'm

16   happy to pull those excerpts out for the Court.  They've

17   obviously been provided to the defense and I would proffer

18   that their testimony is going to be similar.

19           THE COURT:  You've got three witnesses who went

20   in the grand jury who would provide the basis for this

21   coming in under the evidentiary rule.  I understand that.

22           MS. WILKINSON:  Yes, Your Honor.

23           THE COURT:  The only concern I have and I

24   probably have very little concern is that if all three of

25   these witnesses who did grand jury testimony about this

1    balked and didn't testify the way you anticipated.

2    Although at that point you can read the grand jury

3    testimony right in.  Whether we have a bell that can't be

4    unrung.  I don't think so because I know that exactly --

5              MS. WILKINSON:  If I --

6              THE COURT:  I know exactly what you would do if

7    they came in and said I deny.  You can read their grand

8    jury right to the -- under the evidence rules.

9              MS. WILKINSON:  Exactly, Your Honor.  And I have

10   a report of another witness, the correctional officer, a

11   statement that Mr. Morales made to him implicating himself

12   in the murder, too, in addition to the false lie

13   obviously.  So I would prefer to proceed that way just

14   because, you know, the --

15             THE COURT:  Your motion is granted.

16             MS. WILKINSON:  Thank you, Your Honor.

17             THE COURT:  Now that's the 57.  I've got the

18   government's motion concerning statements by represented

19   parties.  I'm not quite sure what you want me to do.  Let

20   me put it this way.  I'm not a stranger to the ethical

21   rules and bear a lot of scars from being involved in

22   ethical issues like this before.  But the question I have

23   when you're talking about the conduct at issue -- and let

24   me put the motion in front of me for a second here -- is

25   the ethical rule that's involved here is one that

1    restricts the attorney from having communications with a

2    party, a represented party who regard to the subject of

3    the representation.  And the specific Rule 4.2(A) provides

4    in representing a client a lawyer shall not communicate

5    about the subject of the representation with a person who

6    the lawyer knows is represented by -- in the matter by

7    another lawyer unless the lawyer has the consent of the

8    other lawyer or is authorized by law or court ordered to

9    do so.

10           So my question is if Mr. Jones is in jail on a

11   shoplifting charge and Mr. Zucker goes to see him about

12   this case, why is that precluded with regard -- in other

13   words, simply the fact that somebody has a lawyer does not

14   mean nobody can talk to him.

15           MR. CLARKE:  Your Honor, the government would

16   actually agree.  Marty Clarke for the government, Your

17   Honor.  May I approach the Court with the Dustin Ray's

18   statement we just received this morning from the defense

19   counsel?

20           THE COURT:  All right.  Let me see it.

21           MR. CLARKE:  The handwritten statement

22   supposedly by Mr. Zucker.  He filled it out at the prison

23   and then gave it to Mr. Ray to affirm under the penalties

24   of perjury.  And, Your Honor, we understand the Court's

25   concern about whether or not speaking to Mr. Ray was about

1    a matter concerning his case.  And our position is that

2    overwhelmingly, it was because Mr. Zucker was aware that

3    Mr. Ray had a drug case and had pled guilty and now

4    thinks, we would allege, that he's cooperating with the

5    government and he's going to go find out if in fact he's

6    cooperating with the government to provide information to

7    get a 5K in his case.

8           So if he goes to Mr. Ray and asks him questions

9    about the information he's going to provide within his

10   case to get the 5K, clearly, Mr. Jerry Ruter, his

11   attorney, would want to be there to protect him within his

12   own case.  I think clearly an attorney just to walk in and

13   say well, you know what, I'm not going to ask you how many

14   kilos you sold, but here is what I am going to ask you.

15   I'm going to ask you what kind of 5K information you have

16   that you're going to provide in the sentencing of your

17   case that's in the case.

18          And I should advise the Court that by this time,

19   Mr. Ray had proffered, we had met with Mr. Ruter, we were

20   talking about his 5K cooperation and how that would help

21   him in his case.

22          And Your Honor, we've provided this motion for

23   two reasons.  One is we wanted to discuss the 4.2 and the

24   ramifications of that.  But we also wanted to frame the

25   possible, what could be a catastrophic event in the middle

1    of the trial.  If Mr. Ray takes the stand, if Mr. Zucker

2    is the one who is cross-examining him and if he presents

3    as a prior inconsistent statement, Mr. Zucker's

4    handwritten note which is totally at odds with what

5    Mr. Ray had already proffered to almost a year earlier,

6    Mr. Ray I will tell the Court is going to say he was

7    scared to death of the attorney who was representing the

8    man who had killed a witness in the past to try and effect

9    a trial.  And he was told by his own attorney, Mr. Ruter

10   told him and, of course, the government said that your

11   safety is paramount and you've got to keep this quiet.

12           So when he was confronted, clearly at the

13   request of Mr. Morales and we're allowed that inference in

14   front of the jury to go and speak to a witness in this

15   case about the admissions to a murder of a witness, Your

16   Honor, that's almost 404(b).  In fact I would argue that

17   it is.  We would hope if this was a different matter, we'd

18   put Mr. Zucker on.  And what we're saying is that if the

19   trial unfolds in that way, right in front of this jury, we

20   have 404(b) happening right before their very eyes by the

21   attorney representing Mr. Morales.  That's the inference.

22           This is a clumsy, heavy-handed approach to go to

23   a witness who is unrepresented under a thin interpretation

24   of 4.2(A) and say it's okay to talk to me.  Oh, and by the

25   way, he never talked to you about his case, did you?  No,

1    he did not.  Will you swear to that?  Put your John

2    Hancock there.  And then as soon as that happens, we get a

3    call from the attorney, look what this attorney is trying

4    to do.

5            It's important to note, Your Honor, that

6    Mr. Ray's cooperation was never disclosed to Mr. Zucker or

7    to Mr. Proctor or to anybody.  How did they know to go to

8    prison?  And on that day, Your Honor, if I put Mr. Zucker

9    on, I'm going to find out that it wasn't just Mr. Ray.  It

10   was also Mr. Stokes who's going to come in and testify to

11   the same thing.  And there's a third person as well.

12           THE COURT:  So this gentleman, Dustin Ray, what

13   is it that you're intending to elicit from him?

14           MR. CLARKE:  He will say that they were both

15   together at the federal detention center in Baltimore

16   City, the Chesapeake Detention Center and Mr. Morales just

17   laid it all out.  He said this is what I did.  It's a

18   little more nuance than that.  But he said look, Robert

19   Long, shot him in the back of the head, turned around,

20   shot him in the eye, fell back, all that stuff.  Give him

21   all the details.  And Mr. Stokes is going to say the same

22   thing.  And they both were approached by the counsel for

23   the defendant in a witness murder case.

24           Then there's a third person, a third person that

25   Mr. Zucker also approached on that same day.  He went to

1    prison on one day and we have the note and we have his

2    signature and his clerk's signature When he went to the

3    C.D.C. to interview these witnesses.  The third witness,

4    Mr. Ray will say, was out in the yard after Mr. Zucker

5    went and spoke to that third witness.  And when they were

6    out in the yard, Mr. Ray will say that Mr. Morales said

7    hey, Witness Number 3, how come you didn't sign my

8    affidavit?  Because that third witness wouldn't sign a

9    handwritten affirmation of what he had said to Mr. Zucker.

10               The note itself and the conditions under which

11   it was written are highly suspect.  At the least, it's a

12   heavy-handed attempt to set up a witness in a federal

13   trial.  At the worst, it's 404(b) witness intimidation.

14   So it's a real problem.  And it's a problem for the Court

15   because and I understand that, you know, we don't have the

16   benefit of the Fourth Amendment on this side of the table.

17   Only has 4.2(A).  And the Court is right when you ask the

18   government what's the sanction here.  You know, even if

19   you were to find that it was unethical, does the Court

20   have the right to preclude what arguably on their side is

21   evidence to be excluded from his trial that's been

22   extracted by his attorney?  I think that's problematic.

23   But at least we need to frame for Your Honor where we're

24   going and have some precautions made before jeopardy

25   attaches.  At least get some discussions with counsel

1    about how to approach this.  And then the Court -- as an

2    officer of the court, we'll have this scenario now and

3    what do we do?

4              THE COURT:  What are we going to do at trial if

5    Dustin Ray gets up on the stand and says what you say he

6    is going to say and then on cross-examination, he's

7    confronted with this statement --

8              MR. CLARKE:  Exactly.

9              THE COURT:  -- and he says I did that because

10   this guy, Zucker, scared the hell out of me and Morales is

11   known to kill people and I wanted to sign whatever he

12   wanted to get him out of my face?  And do we end up having

13   a lawyer witness problem with Mr. Zucker?

14             MR. CLARKE:  I think clearly.

15             THE COURT:  I mean it may be that to respond to

16   that type of testimony from a witness if he says that, it

17   may force Mr. Zucker into becoming a witness to say oh, I

18   didn't do that, I was charming and pleasant and didn't

19   even suggest all these things and so forth.  I mean

20   it's --

21             MR. CLARKE:  Well, and I got to say, Your Honor,

22   two things.  One is again, unless they can say otherwise,

23   we never disclosed Dustin Ray.  So it's coming from the

24   defendant, the person who's on trial for killing a

25   witness, a witness that was discussed with Mr. Ray.  He

1    already told Mr. Ray that he killed a witness in a state

2    case.  And so his -- and that cooperation of Mr. Ray was

3    never made known to defense counsel.  So that's not

4    privileged.  It's an inference that it came from him.

5            Secondly, the nature of this statement, Your

6    Honor, I don't mean to be derogatory, but it's just thin.

7    In an of itself, it's evidence.  The notion that prisoners

8    don't talk about their cases and these are Mr. Zucker's

9    words.  They're not Mr. Morales'.  They are Mr. Zucker's

10   words.  And these aren't Mr. Ray's words.  It's

11   essentially Mr. Zucker asking Mr. Ray, the witness in a

12   murder intimidation case, isn't this true, isn't this

13   true, isn't this true.  Here, sign on the bottom.

14           THE COURT:  So has the existence of this been

15   brought to the attention of the attorney for Dustin Ray?

16           MR. CLARKE:  Yes.

17           THE COURT:  What does he say?

18           MR. CLARKE:  We asked Mr. Ruter to try and get

19   us a copy of this and we have been trying to get a copy

20   and Mr. Zucker was nice enough to give us a copy this

21   morning.

22           MR. ZUCKER:  Excuse me.  The first time it was

23   ever requested was this morning.  It was given to them --

24           THE COURT:  Let me just finish that.  So --

25           MR. CLARKE:  We tried to get it -- what we had

1    hoped to do, Your Honor, is to have this matter pressed

2    through the counsel for Mr. Ray and that wasn't

3    successful.  Mr. Ruter also wanted to get a copy of this,

4    but he didn't just press it as hard -- he is outraged

5    about this.  But he never got a copy for the Court.  So we

6    ended up getting a copy this morning.  So yes, Mr. Ruter

7    is very much aware of it and he's very concerned for

8    Mr. Ray.

9            THE COURT:  Well, what is it that the government

10   proposes that I do?

11           MR. CLARKE:  Well, first of all, Your Honor, I

12   think that the Court should find that the matter about

13   which Mr. Zucker spoke to Mr. Ray is the case was relevant

14   and was essential and was a matter related to the case for

15   which Mr. Ray was still pending sentence.

16           THE COURT:  I understand the government's

17   theory.  It is that this is within the scope of Rule

18   4.2(A) --

19           MR. CLARKE:  Yes.

20           THE COURT:  -- and it is the subject of a

21   representation because this is a defendant who had pled

22   guilty who obviously would like to have whatever his

23   offense level is reduced and it would be in his best

24   interest with counsel representing him to cooperate to try

25   to get a 5K.  And by doing this, it in effect calls into

1    question the 5K.

2              MR. CLARKE:  Correct, Your Honor.

3              THE COURT:  Therefore, it's within the scope of

4    the representation and therefore, it was not proper to

5    solicit it because it was within the scope of the

6    representation.

7              MR. CLARKE:  That is correct.

8              THE COURT:  In 25 words or less, that's your

9    position?

10             MR. CLARKE:  Yes.  And in fact he had provided

11   that proffer and was continuing to proffer around this

12   time.  And Ms. Wilkinson is making a point in my ear --

13             THE COURT:  Listen to her.

14             MR. CLARKE:  -- which is probably going to

15   happen a lot, Your Honor.

16             You know, no other attorney would want their

17   client to be questioned about a matter that no one else

18   knows about that's going to be essential to their client

19   getting a reduced sentence.  The irony of today is that

20   Mr. Zucker and Mr. Proctor questioned an attorney from

21   Texas about the voluntariness of an interview in Texas

22   when an attorney in this case goes under these

23   circumstances in a witness murder to talk to a witness who

24   the witness murderer had made a confession and elicits

25   this kind of response.

1          THE COURT:  Well, are you asking me to exclude

2   this statement?

3          MR. CLARKE:  One moment, Your Honor.

4          (Counsel conferred.)

5          MR. CLARKE:  I don't want to create precedent.

6   I think the precedent of saying that this was a 4.2(A)

7   violation is a good precedent.  I think it's the right

8   one.  What I don't want to do is have an issue brought up

9   on appeal and a 2255 for counsel.  It would seem to me

10  that perhaps counsel can consider and speak with

11  Mr. Morales and talk about whether or not between

12  themselves whether the evidentiary value of the evidence

13  that they obtained of a prior inconsistent statement under

14  the circumstances of this case was a wise course and make

15  some representation --

16          THE COURT:  I don't want to encourage that to

17  happen.  I mean I can't tell the defense what to do and I

18  can't tell the prosecution what to do in terms of what

19  evidence they offer or not offer.  But it seems to me that

20  if this is offered in cross-examination of this or any

21  other witness under similar circumstances, it's going to

22  open the door pretty wide to the government challenging

23  the circumstances under which the statement was obtained

24  and going into questions of whether it was obtained in

25  violation of the rule and --

1        MR. CLARKE:  And, Your Honor, if I may, this

2   Court has the overall Sixth Amendment rights of Mr.

3   Morales to consider and he does have two counsel and if

4   they're going to say that they're going to rely on this,

5   then the Court perhaps maybe to avoid a what appears to be

6   a high probability of an issue of having counsel on the

7   stand and a high probability of an appellate issue or even

8   a mistrial should protect the case up front and not allow

9   Mr. Zucker to participate and make him available to the

10  government.  But hopefully, we can avoid that, Your Honor.

11       THE COURT:  Well, let's hope we can avoid that.

12  I --

13       MR. ZUCKER:  Can I respond at some point, judge?

14       THE COURT:  You're going to have a chance to

15  respond.  I'm just talking out loud.  The concern I

16  have -- I don't know what Dustin Ray is going to say when

17  he's presented with this.

18       MR. CLARKE:  I tell you, we've asked him and his

19  attorney has been present when we've asked him and he said

20  that he was scared to death and he did what he thought he

21  had to do, what would have been required of him which was

22  to keep his cooperation a secret.  So he had to lie for

23  his own safety and to keep it secret per the 5K agreement.

24  And per his plea agreement, he's supposed to keep things a

25  secret and concealed to protect his 5K provision under his

1   plea agreement and that he had to and he felt intimidated

2   and coerced to do it.

3   THE COURT:  All I can say is if this is offered

4   by the defense, it's going to make things very complicated

5   and I'm not going to make a blanket ruling on this right

6   now.  I'm troubled, but let me hear from Mr. Zucker.

7   MR. ZUCKER:  Let me say, first of all, judge, I

8   have an ethical duty to investigate a case.  This was

9   someone who had potential information.  I met with him.  I

10  complied with all the rules and I resent the implication

11  that there was anything menacing, threatening or

12  intimidating about it.  I met with him.  I told him who I

13  was.  I complied with every rule in the book.  Who I was,

14  why I was there.  He had the right to talk to me, not talk

15  to me.  I couldn't force him to talk to me.  If he had a

16  lawyer, I would contact that lawyer and if he wanted me,

17  you know, I would consult with his lawyer.

18  I didn't know exactly why he was at -- I forget

19  the name of the facility -- Chesapeake.  That he was

20  identified as someone who might have information about

21  this and I was under a duty to investigate this.  And I

22  couldn't have complied any more with the rules concerning

23  an attorney interviewing a witness.

24  We had no knowledge, no basis to believe he was

25  cooperating.  Point of fact, I'm not a hundred percent

1    sure, I think he was somebody who actually initiated or

2    requested the contact.  There were several people who

3    communicated or I was told wanted to talk with me.  I

4    believe there had been a separation order and he had asked

5    me to contact -- and I could be confusing someone.  I

6    think he was saying he didn't know why it was on and was

7    upset that it was on as well.

8              There was nothing menacing, nothing

9    intimidating.  And he particularly was told you have

10   absolutely no obligation to talk to me and if you don't

11   want to talk to me, you don't have to.

12             THE COURT:  What about the inherently coercive

13   impact of this?  You have a defendant -- a gentleman who

14   we now know has informed the government that there's been

15   a full confession and so forth by Mr. Morales.  That

16   confession includes having arranged for the killing of a

17   witness.  And he has cooperated.  He's cooperated against

18   somebody who he believes, rightly or wrongly, has arranged

19   to kill a witness in a case.  In comes a lawyer

20   representing that gentleman.  Says I want to talk to you.

21   Isn't there something frightening about the fact that a

22   lawyer representing who he believes is a person who has

23   been willing to kill a witness comes to see him and says

24   he didn't tell you anything, did he, and sign the

25   statement here that says I never discussed the case with

1    him at all?  Isn't there a legitimate fear factor that,

2    gee, if I don't sign this thing, I would be the next guy

3    with a bullet in my head?

4            MR. ZUCKER:  I think there's two separate

5    questions here.  One is the presumption that I led him

6    with -- that I approached him with leading questions.  I

7    asked him if he knew anything, what he knew, what he

8    heard, could he help us.  We went to him looking for

9    information.  All right?

10           THE COURT:  Well, what led you to Dustin Wright?

11           MR. ZUCKER:  What led me to what?

12           THE COURT:  What led you to talk to him at all?

13           MR. CLARKE:  Dustin Ray, Your Honor.

14           THE COURT:  Dustin Ray.  What led you to talk to

15   him in the first place?

16           MR. ZUCKER:  Conversations with my client.

17           THE COURT:  Well, all I can tell you --

18           MR. ZUCKER:  He was somebody who was

19   identified -- and I believe he was the one who indicated

20   that he wanted to talk to me to my client.

21           THE COURT:  All I can tell you is that we're

22   sitting on a bomb here.  And, you know, I think everybody

23   needs to reflect on what happens with this because if this

24   is used in cross-examination of Mr. Ray, it's going to be

25   fair game for Mr. Ray to explain why he signed this and to

1    significantly embellish whatever he said on direct about

2    what Mr. Morales told him and saying I was scared to

3    death, that I would be the next person with a bullet in my

4    head and when his lawyer comes to see me, I'm going to say

5    I didn't say nothing to nobody.

6         MR. ZUCKER:  That would be fine.  Had he said

7    nothing to nobody, that would have been great.  Had he

8    refused to talk to me, that was well within his rights.

9         THE COURT:  No.  I said that's what he I think

10   would be at liberty to say by further examination of the

11   government.

12        MR. ZUCKER:  If we make that strategic decision,

13   we have been advised of the inherent risks.

14        THE COURT:  Well, let me just say this.  I'm

15   going to not act on this motion today.  I'm going to

16   encourage you all to reflect on this because I do think

17   that we can get into one significant heck of a mess

18   dealing with this and it in fact might hurt the defendant.

19   That's my concern.  If he's not a witness who is going to

20   say, you know, I'm a guy in jail and this guy told me he

21   committed all kinds of crimes, jurors are going to look at

22   that a little suspiciously to begin with.  But then if on

23   cross-examination this comes out, they're going to

24   significantly potentially -- I'm not saying this is the

25   case -- would give the direct examination far more

1    significance because his answer to why he signed this

2    embellishes what he said in the first place about

3    Mr. Morales telling him things.  So it's a trial strategy

4    thing and I got to protect the record for everybody here,

5    too, and I'm not going to make a ruling on this.  But I do

6    have a concern about the communication.  I don't know

7    enough about what this gentleman's lawyer has to say about

8    this.  We'll see what he had to say about it.  He may feel

9    strongly the other way or may not care.  I don't know.

10           But the purpose of Rule 4.2(A) is to be certain

11   that a represented party does not have people

12   communicating with them about the subject of

13   representation without notice to that lawyer and

14   participation.  And the government makes a significant

15   case that this is a person sitting in the Chesapeake

16   Detention Center, awaiting sentencing, hoping and praying

17   that he's going to get the benefit of a downward departure

18   and is approached by a lawyer for somebody who he thinks

19   is a witness killer and the last thing in the world he

20   wants to have out there is that he is cooperating.  So

21   it's a predicament.  What I would urge both sides to do is

22   to think about this one because this could erupt into a

23   big problem for the trial, but it could also erupt into a

24   prejudicial problem for the defendant.  But that's just my

25   musings.  I'm going to defer ruling on this motion.  All

1    right.

2            Now what else do we have because I have a civil

3    case that's ready to start in a few minutes here.

4            MS. WILKINSON:  Your Honor, I think the last

5    motion just is with regard to the proffer statements and

6    we have been discussing in great detail what might open

7    the door, not open the door to Mr. Morales' confession in

8    this case.

9            THE COURT:  Right.

10           MS. WILKINSON:  And I have spoken to both

11   counsel about it.  And we'll continue to work that out,

12   Your Honor.  There are a couple of little issues.  The

13   bottom line to our motion was that we didn't want counsel

14   arguing something in opening statements that would open

15   that door and --

16           THE COURT:  Which motion is this?

17           MS. WILKINSON:  This is Docket Number 62.

18           THE COURT:  62.  Let me put it in front of me

19   here.

20           MS. WILKINSON:  And I think the main thing for

21   the Court though is that we attached the proffer statement

22   because the Court hadn't seen that yet.  So the Court will

23   know what Mr. Morales told us about the murder in very

24   explicit detail including who did it.  And if they take

25   the position and argue something outside that, the

1    government is going to contend that they've opened the

2    door and I know that they're aware of that.  This is just

3    about the argument at this point and we will continue to

4    talk about it.  Have I represented that fairly, counsel?

5    Mr. Proctor?

6              MR. PROCTOR:  Yes.

7              MR. ZUCKER:  I guess the difference is there is

8    probably a difference of opinion frequently about what is

9    opening the door and we will continue to try and work that

10   out.

11             THE COURT:  Well, try to work it out because

12   what I'd like to do is have you steer away from this in

13   opening statements.  And then if it turns out that

14   something would be appropriate, it may end up being proper

15   for closing argument depending on what the evidence is at

16   trial.

17             MR. ZUCKER:  Understood.  But I guess the point

18   is where there is a difference of opinion, it would be

19   helpful to the parties if the Court would entertain

20   motions in limine, i.e., we believe this would not open

21   the door, they believe it would.  If we get a ruling from

22   the Court --

23             THE COURT:  Tell me what motion you entertain.

24             MS. WILKINSON:  I'll give you an example.  A

25   witness -- a shooting happened behind a park in Baltimore

1    and one of the park workers who called 911 had seen out of

2    a corner of her eye what she believed was a young black

3    man running from the scene and she says that on a 911

4    tape.  And there's no doubt here today that Mr. Morales

5    has told us that the men who killed Rob Long were not

6    African-American.  They were two white men.  And

7    therefore, the government's view that if they elicit

8    evidence, corroborative evidence that a witness saw

9    someone other than a white man running from the scene to

10   be able to argue that someone else was the shooter in this

11   case, that clearly opens the door in this case because

12   that would be putting in evidence different than

13   Mr. Morales' proffer and that's the best example I can

14   give you.

15             THE COURT:  Well, I mean if that's what you're

16   saying, then I'm going to grant the motion which simply

17   means that if you are going to make an argument that is

18   inconsistent with the proffer, that will relieve the

19   government of its obligation not to use the proffer.

20             MR. ZUCKER:  We understand that's the ruling.

21   There may be a difference of opinion as to what is and

22   isn't inconsistent.

23             THE COURT:  The best thing to do is to avoid

24   wandering into this in opening statements.

25             MR. ZUCKER:  I think that's fair and I think we

1    both will certainly agree to try to avoid that.  And I

2    just wish to alert the Court that there probably will be

3    times that we will seek to address the Court at the bench

4    or in limine about this.

5              THE COURT:  Well, I'm sure we will be talking a

6    lot up here with the usher on.

7              MR. ZUCKER:  But I meant in limine so we don't

8    accidentally trip over the landmine.

9              THE COURT:  All right.  Do I have everything

10   covered?  I think I do.

11             MR. CLARKE:  Your Honor, Mr. Ray's letter is

12   Government's 1 for purposes of the pretrial motion.

13   Correct?

14             THE COURT:  Mr. Ray's what?

15             MR. CLARKE:  Statement that I provided Your

16   Honor with marked as an exhibit.

17             THE COURT:  I don't think it's been marked.

18             MR. CLARKE:  Government's 3.

19             THE COURT:  Government's 3.  Okay.  You may

20   leave this one here for --

21             MR. CLARKE:  Yes.

22             MS. WILKINSON:  Your Honor, I know the Court has

23   another hearing.  I just wanted to raise one issue that if

24   the Court needs us to brief, I don't know how counsel

25   feels about it yet.  I did highlight it with them.  One of

1    the witnesses that the government intends to call is a

2    reporter from the City Paper in Baltimore and we have

3    obtained the appropriate approvals to be able to call the

4    reporter and it's with reference to statements that

5    Mr. Morales made to him on April 17, 2008 that were

6    published in the City Paper at the time.  And the reporter

7    had intended to cover the trial.  And wants to cover the

8    trial apart from his testimony.  And we would ask for a

9    exception to the rule on witnesses for Mr. Ericson to be

10   able to cover the trial, but to be able to testify because

11   his testimony is limited to the statements.

12            THE COURT:  What is the position of the defense?

13            MR. PROCTOR:  Absolutely not.  He should be the

14   first witness if they want to call him.  I don't want his

15   testimony colored by what everybody else says.  If he

16   wants to cover it, the government is welcome to call him

17   first off the bat.

18            MS. WILKINSON:  The government's response to

19   that, Your Honor -- and I know that this is a new issue to

20   the Court and we can cover it on Tuesday -- is that

21   Mr. Ericson's testimony can't be colored by any other

22   witnesses because he's limited to testifying only about

23   what's in the newspaper article.  That's the limit.

24   Unless they want to color his testimony --

25            THE COURT:  This is a new one.  I'm not going to

1   rule on it today.  You have to give me some law that you

2   haven't given me.

3          MS. WILKINSON:  Very well, Your Honor.  If there

4   is law, I will bring it to the Court's attention.  I have

5   to look at the actual rule on witnesses and I'll --

6          THE COURT:  Look at the rule and see if I have

7   the authority to make an exception.  And there might -- if

8   there is ability to make an exception, there might be some

9   prophylactic method to be able to do it.  I mean the rule

10  is intended to preclude witnesses from reinforcing each

11  other by listening to the testimony both before and after

12  and discussing it and so forth and --

13         MS. WILKINSON:  There's --

14         THE COURT:  It sounds to me -- but I don't know

15  if there's an ability to make an exception.  If what

16  you're saying is that all he's going to testify about is

17  that I'm a reporter and Mr. Morales told me the following

18  things that I put into a story that was published,

19  period --

20         MS. WILKINSON:  Exactly.

21         THE COURT:  -- I'm not sure how that gets

22  reinforced or anything else by virtue of observing a

23  trial.  But --

24         MS. WILKINSON:  Balancing with the freedom of

25  the press.

1          THE COURT:  The reporter ultimately may have to

2     have a Hobson's choice.  You're under subpoena and go get

3     another reporter.

4          MS. WILKINSON:  Understood.  Complicated issues

5     of freedom of the press and the right to the government to

6     have a witness, Your Honor.

7          THE COURT:  Well, you can give me some

8     additional thinking on that on Monday afternoon maybe and

9     I will try to keep up with it.  Now how much time does

10    each side want for opening statements?

11         MS. WILKINSON:  Your Honor, I would think I

12    would not be longer than 45 minutes.

13         THE COURT:  And defense?

14         MR. ZUCKER:  Probably about the same.

15         THE COURT:  All right.  So I mean I'm not a guy

16    that sits up here with a clock.  But, you know, if you

17    tell me 45 and you're rounding around 55 and 60, I may

18    start clearing my throat a lot.

19         MS. WILKINSON:  I'm a pretty good clock watcher.

20    Your Honor, the one thing that the government would ask

21    for some guidance on just because of witness scheduling.

22    We were thinking that Tuesday would be jury selection and

23    possibly opening unless counsel really want to do openings

24    on Wednesday and then start the actual witness testimony

25    on Wednesday.

1          THE COURT:  I'm hopeful that we will get all of

2     the jury selection done on Tuesday and maybe opening

3     statements.  I think that we are probably going to be so

4     dead tired after we've gotten that done, that it's not

5     likely I'll see any witnesses on Tuesday.

6          MS. WILKINSON:  So it would be all right if I

7     had our first witness ready to go first thing Wednesday

8     morning?

9          MR. ZUCKER:  No objection.  In all candor, I

10    don't know -- I may have picked a jury with you and I'm

11    not sure about the procedures.  I'll discuss it with Mr.

12    Proctor.  But I got a feeling, it will probably take the

13    best part of the day if not all day.

14         THE COURT:  Oh, I don't disagree.  I can see the

15    number of people and extremists about being on a jury

16    service for four weeks.

17         MS. WILKINSON:  Two to three weeks, Your Honor.

18    I think we have it narrowed down to --

19         THE COURT:  Well, I know.  But I'm going to tell

20    them it's long as four.  All right.  And remember, I need

21    to have somebody submit to me a jointly-approved short

22    version of the elements.  I don't need the explication of

23    the elements.  I just need the elements.

24         MS. WILKINSON:  I will provide that to your

25    clerk today, Your Honor.

1          THE COURT:  All right.

2          MR. ZUCKER:  Judge, should we just agree to open

3    on Wednesday?

4          THE COURT:  Excuse me?

5          MR. ZUCKER:  I wonder if we should just agree to

6    open on Wednesday.

7          THE COURT:  No.  I want you to be ready on

8    Tuesday.  You may end up doing it on Wednesday.  But I'd

9    rather -- if I manage to get the jury selected early

10   Tuesday afternoon, I want to go to openings.

11         MS. WILKINSON:  And I mean I'm prepared to go

12   forward.  Our calendar is based on --

13         THE COURT:  I don't want to have openings split

14   between days.  That I don't want to have.  So if we're

15   going to do openings, we're going to have to have

16   everybody ready to go by 3.  If we haven't got a jury

17   selected by 3, then we'll probably have to go --

18         MS. WILKINSON:  That sounds fair and reasonable,

19   Your Honor.

20         THE COURT:  But I don't want to be suddenly done

21   with jury selection at 1 and recess for the day.  I'd like

22   to get the case moving along.  Okay.  Well, we'll see you

23   Tuesday.

24         THE DEFENDANT:  Your Honor, could I speak before

25   we go?  I have a couple of questions I'd like to ask you.

1          THE COURT:  Tell your counsel what the questions

2    are and I'll address them.

3          MR. ZUCKER:  I guess the best way to summarize

4    it, Mr. Morales has been given access and made good use of

5    much of the discovery and he has some questions.  I think,

6    frankly, they should be raised with the prosecutor before

7    they are raised with you.  So what I've told him is if the

8    marshals allow him to remain here, I will remain here

9    today for as long as it takes to make sure I understand

10   exactly what he wants and if the prosecutors make

11   themselves available and they are indicating they will, I

12   will raise it with them today before I leave the

13   courthouse.

14         THE COURT:  That would be fine.  All right.  I'm

15   going to take a 15-minute recess and then I will begin the

16   civil case.

17         MS. WILKINSON:  Thank you, judge.

18         (Proceedings concluded.)

19

20

21

22

23

24

25

1                      <u>CERTIFICATE OF REPORTER</u>

2

3          I, Lisa K. Bankins, an Official Court Reporter

4     for the United States District Court for the District of

5     Maryland, do hereby certify that I reported, by machine

6     shorthand, in my official capacity, the proceedings had

7     and testimony adduced upon the motions hearing in the case

8     of the United States of America versus Jose Joaquin

9     Morales, Criminal Action Number RWT-12-0480, in said court

10    on the 20th day of September, 2013.

11         I further certify that the foregoing 99 pages

12    constitute the official transcript of said proceedings, as

13    taken from my machine shorthand notes, together with the

14    backup tape of said proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16    name, this 7th day of March, 2014.

17

18

19                             *Lisa K. Bankins*

20                             Lisa K. Bankins
                               Official Court Reporter
21

22

23

24

25

'08 [1]  26/19

**0**

0480 [3]  1/3 3/4 100/9
08 [2]  41/23 41/24

**1**

10 [1]  10/10
103 [4]
1350 [1]  1/17
14 [2]  13/22 44/16
14th [1]  40/23
15 [4]
15-minute [1]  99/15
16 [1]  10/10
17 [4]
1999 [1]  21/5

**2**

20 [2]  1/5 2/5
20036 [1]  1/18
2008 [15]
2013 [2]  1/5 100/10
2014 [1]  100/16
202 [1]  1/18
20770 [1]  1/22
20th [1]  100/10
21 [1]  39/5
21201 [1]  1/13
21202 [1]  1/15
21st [1]  39/4
2255 [2]  64/1 83/9
24th [1]  3/8
25 [1]  82/8
26th [1]  28/10
27 [2]  27/20 31/5
27th [6]
28th [3]  27/24 28/6 28/10
29th [1]  27/25

**3**

30 [1]  41/4
30 miles [1]  62/25
36 [3]  1/12 10/9 10/13
37 [1]  2/5
3:25 [2]  23/24 34/9

**4**

4.2 [7]
404 [7]
410 [1]  32/23
45 [2]  96/12 96/17

**5**

50 [1]  14/25
53 [1]  2/6
54 [2]  15/6 17/14
55 [1]  96/17
57 [2]  67/2 73/17
58 [4]
59 [1]  2/6
5K [10]
5K1's [1]  32/7

**6**

60 [4]
62 [2]  90/17 90/18
6500 [1]  1/21

**7**

70 [2]  31/21 31/25

**7**

78 [2]  15/7 17/15
7th [1]  100/16

**8**

8-21-08 [2]  41/23 41/24
81 [1]  15/10
82 [1]  15/16
86 [1]  15/19

**9**

911 [2]  92/1 92/3
99 [1]  100/11
9:00 [1]  1/6

**A**

a.m [1]  1/6
ability [3]  95/8 95/15 100/14
able [13]
about [102]
absent [2]  22/4 30/23
absolutely [6]
abuse [1]  12/2
access [2]  12/15 99/4
accidentally [1]  93/8
according [2]  39/3 52/2
account [1]  20/3
accurate [1]  32/17
act [1]  88/15
Action [1]  90/9
active [1]  65/1
actual [3]  40/22 95/5 96/24
actually [6]
addition [4]
additional [3]  10/20 11/7 96/8
address [6]
addressed [1]  7/25
adduced [1]  100/7
adequate [3]  67/14 67/19 67/22
administrator [1]  26/8
admissible [1]  67/13
admissions [2]  51/19 76/15
admit [3]  51/22 67/1 71/21
admitted [2]  64/21 66/17
advance [2]  6/16 13/17
advanced [1]  18/5
advice [2]  18/5 52/5
advise [1]
advised [4]
affidavit [1]  78/8
affirm [1]  74/23
affirmation [1]  78/9
African [1]  92/6
African-American [1]  92/6
after [12]
afternoon [2]  96/8 98/10
Afterwards [1]  29/13
again [18]
against [6]
agencies [1]  55/17
agency [2]  55/10 55/12
agent [7]
agents [6]
agents' [1]  57/4
ago [4]
agree [10]
agreement [6]
agreements [5]
airport [2]  44/7 55/19
alert [1]  93/2
alibi [2]  15/1 15/3
all [89]
allege [1]  75/4
allegedly [2]  16/12 66/1

allow [5]
allowed [1]  76/13
allows [1]  26/9
alluded [1]  69/15
almost [3]  32/4 76/5 76/16
along [2]  31/9 98/22
already [10]
also [11]
alternate [2]  9/6 10/7
alternates [2]  10/11 10/12
although [2]  45/4 73/2
always [7]
am [4]
Amendment [2]  78/16 84/2
AMERICA [3]  1/3 3/3 100/8
American [1]  92/6
amount [3]  44/11 55/8 55/14
amounts [1]  12/19
analysis [2]  65/13 72/6
analyzed [1]  65/20
another [18]
answer [6]
anticipated [1]  73/1
anxious [1]  66/7
any [42]
anybody [8]
anyone [4]
anything [11]
anyway [1]  44/4
apart [1]  94/8
apparent [1]  66/6
appeal [2]  63/25 83/9
appear [2]  43/21 65/6
appearance [7]
appearances [2]  1/10 42/11
appears [2]  39/13 84/5
appellate [1]  84/7
applies [1]  7/2
appreciate [1]  20/18
approach [4]
approached [6]
appropriate [5]
approvals [1]  94/3
approved [1]  97/21
approximately [1]  39/14
April [1]  94/5
April 17 [1]  94/5
are [64]
aren't [1]  80/10
arguably [1]  78/20
argue [5]
arguing [1]  90/14
argument [9]
arise [1]  13/3
around [3]  77/19 82/11 96/17
arranged [2]  86/16 86/18
arrest [3]  24/1 29/15 55/16
arrested [12]
article [1]  94/23
articulate [1]  66/12
as [65]
ask [29]
asked [9]
asking [13]
asks [1]  75/8
aspects [1]  22/23
assessment [1]  29/24
assistance [2]  64/4 64/9
Assistant [7]
associated [2]  21/17 28/21
assume [3]  4/5 39/15 68/23
assuming [2]  17/20 67/14
at [95]

Case 1:12-cr-00400-DKC Document 177 Filed 03/07/13 Page 1 of 110

## A

attached [1] 90/21
attaches [1] 78/25
Attachment [1] 39/14
attacking [1] 19/24
attempt [1] 78/12
attention [3] 43/25 80/15 95/4
attorney [44]
Attorney's [11]
attorney/client [10]
attorneys [8]
August [19]
August 1 [1] 54/5
August 15 [3] 39/14 39/15 39/19
August 2008 [1] 54/4
August 21 [1] 39/5
August 21st [1] 39/4
August 27 [2] 27/20 31/5
August 27th [2] 31/4 58/7
August of [1] 21/17
AUSA [3] 52/4 65/7 65/7
AUSAs [1] 26/9
authority [2] 61/22 95/7
authorized [2] 11/4 74/8
available [4]
Avenue [1] 1/17
avoid [5]
awaiting [1] 89/16
awake [1] 63/6
aware [8]
away [2] 62/25 91/12

## B

B.S [2] 30/6 30/7
back [19]
backup [1] 100/14
bad [1] 52/5
bag [1] 44/13
bail [2] 52/7 52/14
Balancing [1] 95/24
balked [1] 73/1
Baltimore [10]
Bankins [4]
based [9]
basic [3] 4/20 9/14 29/23
basis [8]
bat [1] 94/17
bathroom [1] 44/14
battle [1] 44/21
be [126]
bear [1] 73/21
became [1] 68/24
because [41]
becomes [1] 16/19
becoming [1] 79/17
been [41]
before [26]
beforehand [1] 67/8
begin [2] 88/22 99/15
beginning [2] 7/8 52/4 63/8
behalf [4]
behind [3] 8/20 72/9 91/25
being [19]
believe [28]
believed [1] 92/2
believes [2] 86/18 86/22
bell [2] 68/8 73/3
below [1] 66/11
bench [3] 9/24 43/5 93/3
benefit [6]
benefits [3] 11/21 11/23 27/19
Benson [1] 56/7

best [13]
bets [1] 46/19
better [3] 25/12 28/20 33/3
between [5]
beyond [1] 49/19
big [7]
bind [2] 37/6 37/10
bit [2] 26/17 32/22
black [2] 60/22 92/2
blame [1] 66/19
blanket [1] 85/5
boilerplate [2] 26/12 26/15
bomb [1] 87/22
bond [2] 30/5 44/1
book [1] 85/13
both [11]
bottom [2] 80/13 90/13
boxes [1] 54/12
bridge [1] 67/20
brief [2] 70/13 93/24
briefing [1] 59/3
briefly [1] 67/8
bring [4]
broad [1] 22/1
broader [1] 22/9
brought [4]
building [1] 54/6
bullet [5]
business [1] 6/21
busy [1] 65/1
but [102]
button [1] 16/24

## C

C.D.C [1] 78/3
calendar [1] 98/12
call [11]
called [2] 18/24 92/1
calling [6]
calls [2] 34/4 81/25
came [7]
can [68]
can't [24]
candor [1] 97/9
capability [1] 49/14
capacity [2] 10/7 100/6
car [2] 55/9 56/25
care [5]
career [6]
case [73]
case-by-case [1] 33/6
cases [7]
cash [1] 44/11
Castigar [2] 26/1 27/2
catastrophic [1] 75/25
categories [1] 9/14
cell [1] 34/12
center [5]
certain [5]
certainly [5]
CERTIFICATE [1] 100/1
certify [2] 100/5 100/11
challenges [1] 4/12
challenging [1] 83/22
chance [4]
charge [1] 74/11
charged [4]
charges [2] 49/17 50/15
Charles [1] 1/12
charming [1] 79/18
chart [1] 13/21
Charter [1] 44/9
Chasanow [1] 70/12

Check [1] 34/12
checking [1] 52/22
Cherrywood [1] 1/21
Chesapeake [3] 77/16 85/19 89/15
choice [1] 96/2
chronologically [1] 70/6
chronology [1] 19/11
Circuit [2] 12/12 12/24
circumstances [6]
cited [3] 61/19 67/15 70/13
City [3] 77/16 94/2 94/6
civil [2] 90/2 99/16
clarification [1] 21/20
clarify [3] 16/22 21/15 59/23
CLARKE [1] 1/12 3/5 74/16
clear [10]
clearing [1] 96/18
clearly [6]
clerk [2] 19/1 97/25
clerk's [1] 78/2
client [34]
client's [2] 28/17 30/1
clients [5]
clock [2] 96/16 96/19
close [5]
closed [3] 54/12 54/17 54/18
closing [2] 63/12 91/15
clumsy [1] 76/22
co [1] 68/25
co-defendant [1] 68/25
cocaine [1]
coerced [1] 85/2
coercive [1] 86/12
Coladas [1] 63/1
colleague [1] 63/9
color [1] 94/24
colored [2] 94/15 94/21
come [16]
comes [9]
comfortable [1] 5/4
coming [10]
comment [1] 51/3
comments [1] 72/5
committed [1] 88/21
communicate [2] 8/11 74/4
communicated [1] 86/3
communicating [1] 89/12
communication [3] 22/21 23/5 89/6
communications [3] 22/9 22/16 74/1
community [1] 29/25
competent [2] 47/8 62/14
complaint [2] 38/20 40/11
completed [1] 4/9
completely [1] 71/25
complicated [2] 85/4 96/4
complied [3] 85/10 85/13 85/22
component [1] 55/6
computers [1] 54/7
concealed [1] 84/25
concern [7]
concerned [1] 81/7
concerning [3] 73/18 75/1 85/22
concluded [1] 99/18
conclusions [1] 51/11
conditions [1] 78/10
conduct [2] 62/4 73/23
confer [2] 6/5 26/15
conferred [6]
confessed [3] 33/17 40/23 65/4
confessing [2] 33/14 33/15
confession [6]
confidential [1] 22/19
confidentiality [1] 21/25 22/10

## C

confinement [1] 49/4
conflict [1] 69/1
confronted [2] 76/12 79/7
confusing [1] 86/5
Connecticut [1] 1/17
connection [4]
consent [3] 22/6 22/7 74/7
consider [3] 71/15 83/10 84/3
considered [1] 24/2
consistent [1] 12/16
constitute [1] 100/12
constitution [1] 62/18
constitutional [1] 62/5
consult [6]
contact [3] 85/16 86/2 86/5
contacted [2] 21/16 23/14
contend [1] 91/1
CONTENTS [1] 2/1
context [1] 39/1
continue [3] 90/11 91/3 91/9
continuing [2] 39/20 82/11
controversial [1] 4/7
controversy [1] 5/4
conversation [1] 43/11
conversations [5]
convictions [1] 11/19
convince [1] 30/13
cooperate [1] 81/24
cooperated [4]
cooperating [6]
cooperation [7]
copy [9]
corner [2] 58/6 92/2
correct [44]
correctional [3] 70/22 71/17 73/10
corroborating [1] 71/1
corroboration [1] 27/2
corroborative [1] 92/8
corrupt [3] 30/5 30/18 44/24
could [19]
couldn't [6]
counsel [38]
count [2] 4/5 43/7
counted [1] 31/24
county [6]
couple [5]
course [10]
court [62]
Court's [4]
courthouse [1] 99/13
courtroom [2] 8/7 14/14
courts [1] 56/8
cover [6]
covered [2] 16/14 93/10
create [1] 83/5
credibility [2] 46/22 51/3
credible [3] 65/25 66/3 66/21
crime [4]
crimes [1] 88/21
criminal [11]
crisis [1] 9/9
critical [1] 3/24
cross [11]
cross-examination [9]
cross-examining [1] 76/2
crystal [1] 11/18
culpability [2] 40/19 40/19
Currently [1] 26/7

## D

D.C [2] 1/18 25/20

## D.E.A

D.E.A [2] 3/7 24/6
da [8] 4/25 4/25
da-ta-da [1] 4/25
danger [1] 29/25
darn [1] 63/3
date [5]
dates [5]
day [32]
days [8]
dead [1] 97/4
deal [3] 18/8 31/10 31/14
dealing [4]
death [3] 76/7 84/20 88/3
debrief [1] 58/9
debriefed [1] 36/11
debriefing [11]
debriefings [3] 48/10 49/11 51/15
deceiving [1] 67/1
decide [2] 16/9 69/8
decision [2] 47/7 88/12
defendant [20]
defendant's [2] 17/5 57/20
defendants [1] 23/23
defense [23]
defer [1] 89/25
deficiency [1] 66/16
definition [1] 32/15
demeanor [2] 49/10 49/18
demonstrate [1] 68/23
demonstrating [1] 68/14
demonstration [1] 11/1
denial [2] 66/3 66/20
denied [4]
deny [6]
departure [1] 89/17
depending [2] 25/17 91/15
depends [1] 19/13
Deputy [1] 19/1
derivatively [1] 27/3
derogatory [1] 80/6
describe [1] 60/21
describing [1] 63/23
designed [1] 68/15
detail [3] 33/18 90/6 90/24
detailed [1] 4/12
details [1] 77/21
detective [1] 62/12
detention [11]
determine [1] 11/16
did [65]
didn't [25]
difference [5]
different [5]
dire [2] 9/12 9/12
direct [10]
directions [1] 40/25
directs [1] 8/6
dirty [1] 50/14
disagree [2] 64/16 97/14
disciplinary [1] 28/16
disclosable [1] 13/13
disclose [1] 6/23
disclosed [3] 12/21 77/6 79/23
disclosure [4]
discourage [1] 62/4
discovery [1] 99/5
discuss [4]
discussed [9]
discusses [1] 32/22
discussing [3] 28/17 90/6 95/12
discussion [4]
discussions [6]
dispose [1] 10/22

dispute [2] 14/5 57/1
distribute [1] 9/8
divide [1] 9/13
division [3] 1/2 26/22 27/1
divorce [1] 54/6
divorced [1] 54/5
do [87]
docket [9]
document [3] 10/23 25/22 27/23
documented [2] 56/19 56/21
documents [6]
does [20]
doesn't [5]
doing [4]
don't [102]
done [8]
door [8]
double [1] 11/16
doubt [3] 50/20 50/25 92/4
down [19]
downward [1] 89/17
drawing [1] 43/25
drinking [1] 62/25
drive [3] 54/11 56/24 64/21
drug [8]
duces [1] 53/14
duly [1] 18/25
during [8]
Dustin [9]
dutch [1] 11/16
duty [3] 21/24 85/8 85/21

## E

each [5]
ear [1] 82/12
earlier [1] 76/5
early [1] 98/9
East [1] 1/15
easy [1] 65/14
edit [1] 7/25
edits [1] 8/14
effect [2] 76/8 81/25
effective [2] 64/4 64/9
Eight [1] 1/15
either [2] 28/14 56/21
elapsed [1] 29/15
electronically [1] 53/19
elements [13]
elicit [2] 77/13 92/7
elicits [1] 82/24
else [8]
embellish [1] 88/1
embellishes [1] 89/2
encourage [2] 83/16 88/16
end [8]
ended [1] 81/6
enforce [1] 63/6
enjoy [1] 27/19
enough [4]
enter [3] 39/1 39/6 40/9
entered [1] 39/20
entertain [3] 12/12 91/19 91/23
entitled [1] 61/7
ERIC [6]
Ericson [1] 94/9
Ericson's [1] 94/21
erroneous [1] 32/15
error [1] 15/17
erupt [2] 89/22 89/23
ESQUIRE [4]
essence [1] 25/21
essential [2] 81/14 82/18
essentially [3] 17/16 33/13 80/11

**E**

established [1] 62/6
establishes [1] 62/1
ethical [5]
even [9]
event [1] 75/25
ever [2] 23/23 80/23
every [5]
everybody [4]
everything [4]
evidence [20]
evidentiary [6]
exact [2] 31/5 56/5
exactly [14]
examination [22]
examined [1] 19/1
examining [1] 76/2
example [2] 91/24 92/13
exception [4]
exceptions [1] 16/14
excerpts [1] 72/16
exchange [1] 21/21
excludable [1] 18/6
exclude [1] 83/1
excluded [1] 78/21
excluding [3] 22/15 63/15 63/16
exclusion [3] 62/15 62/19 63/22
exclusionary [2] 62/2 62/22
Excuse [3] 20/8 80/22 98/4
excused [1] 60/17
exhibit [5]
existed [1] 63/4
existence [2] 71/23 80/14
expect [1] 55/18
expectation [1] 50/8
experience [3] 42/6 44/16 70/12
explain [1] 87/25
expletive [1] 45/21
explication [1] 97/22
explicit [1] 90/24
extent [5]
extracted [1] 78/22
extremists [1] 97/15
extricate [1] 70/20
extrinsic [1] 17/7
eye [3] 40/18 77/20 92/2
eyes [2] 4/13 76/20

**F**

F-E-R-K-O [1] 24/15
face [1] 79/12
facility [1] 85/19
facing [3] 38/9 44/21 49/16
fact [16]
factor [1] 87/1
factors [1] 29/24
facts [2] 22/23 29/12
factual [1] 18/9
failed [1] 54/17
failing [1] 32/14
fair [18]
fairly [2] 67/9 91/4
fairness [2] 12/17 71/21
false [1] 73/12
familiar [1] 62/6
famous [1] 34/9
far [2] 53/6 88/25
farther [1] 69/13
faulting [1] 63/18
fear [1] 87/1
fears [1] 70/19
federal [13]

federally [1] 23/22
feel [2] 89/6
feeling [1] 97/12
feels [1] 93/25
fell [2] 17/24 77/20
felt [2] 49/16 85/1
female [1] 60/22
Ferko [19]
few [4]
fifty [1] 30/3
file [3] 53/14 54/1 54/15
filed [4]
files [5]
filing [1] 40/3
filled [1] 74/22
find [11]
finding [1] 64/16
finds [2] 23/10 67/10
fine [3] 8/14 88/6 99/14
finish [2] 16/23 80/24
fired [2] 39/24 51/10
first [27]
fishing [1] 11/2
five [3] 23/25 28/11 34/21
flag [1] 16/8
flew [5]
flexibility [1] 26/9
floor [2] 56/7 56/10
Florida [1] 14/12
focus [2] 18/4 21/6
follow [1] 6/20
following [2] 28/4 95/17
follows [1] 19/1
force [2] 79/17 85/15
foregoing [1] 100/11
forget [3] 57/23 58/1 85/18
form [2] 4/3 11/5
former [1] 54/4
forth [7]
forward [1] 98/12
found [2] 65/24 66/19
foundation [4]
four [9]
four-week [1] 3/23
Fourth [3] 12/12 12/23 78/16
frame [2] 75/24 78/23
frankly [2] 41/8 99/6
freedom [2] 95/24 96/5
frequently [1] 91/8
frightened [1] 49/19
frightening [1] 86/21
front [11]
full [2] 12/15 86/15
furnished [1] 64/8
further [7]
fussy [1] 58/2
future [1] 41/5

**G**

game [2] 16/21 87/25
garbage [1] 30/7
Garrett [1] 25/1
Gary [3] 1/14 1/14 3/16
gave [5]
gee [1] 87/2
generally [3] 10/25 32/9 46/3
gentleman [6]
gentleman's [1] 89/7
get [42]
get-go [1] 24/2
gets [6]
getting [5]
give [13]

given [13]
giving [2] 5/4 17/21
glad [4]
global [3] 16/5 16/15 32/9
go [35]
goes [4]
going [91]
good [12]
got [17]
gotten [2] 32/7 97/4
government [56]
government's [18]
grand [5]
Grande [1] 41/3
grant [2] 15/16 73/15
granted [2] 15/16 73/15
Gray [1] 70/13
great [2] 66/9 88/7 90/6
Greenbelt [3] 1/4 1/22 9/9
grounds [1] 11/7
guess [10]
guidance [1] 96/21
guilty [2] 75/3 81/22
guy [7]

**H**

H-U-L-I-N-G [1] 24/23
had [84]
hadn't [1] 90/22
half [1] 10/3
Hancock [1] 77/2
hand [1] 18/21
handed [2] 76/22 78/12
handwritten [3] 74/21 76/4 78/9
happen [5]
happened [8]
happening [2] 28/8 76/20
happens [5]
happy [5]
hard [4]
has [38]
Hasbib [1] 32/18
have [197]
haven't [7]
having [9]
he [186]
he's [29]
head [4]
health [1] 12/2
hear [14]
heard [8]
hearing [13]
hearsay [1] 68/11
heavily [1] 12/19
heavy [2] 76/22 78/12
heavy-handed [2] 76/22 78/12
heck [1] 88/17
hell [2] 31/17 79/10
help [10]
helped [1] 50/17
helpful [2] 50/7 91/19
her [1]
here [47]
hereby [1] 100/5
hereto [1] 100/15
herself [1] 27/11
hey [1] 78/7
Hidalgo [2] 54/23 55/3
high [4]
higher [1] 47/3
highlight [1] 93/25
highly [2] 49/12 78/11
him [77]

Case 1:12-cr-00480-DKC Document 177 Filed 03/07/14 Page 105 of 110

## H

himself [15]
hired [2] 23/16 42/14
hiring [1] 29/16
his [84]
Hispanic [1] 60/22
history [6]
Hobson's [1] 96/2
hold [2] 35/13 35/13
home [1] 7/1
honesty [1] 23/23
Honor [59]
HONORABLE [1] 1/8
hope [3] 3/13 76/17 84/11
hoped [1] 81/1
hopeful [1] 97/1
hopefully [1] 84/10
hoping [1] 89/16
hot [1] 16/24
hour [1] 10/3
how [17]
huge [1] 16/1
huh [1] 52/6
Huling [1] 24/22
hundred [1] 85/25
hurt [2] 48/22 88/18

## I

I'd [8]
I'll [10]
I'm [87]
I've [11]
I.C.E [1] 47/25
i.e [1] 91/20
idea [1] 46/3
identification [2] 38/12 57/20
identified [2] 85/20 87/19
idiosyncratic [1] 26/10
if [134]
impact [1] 86/13
impanel [2] 9/6 10/6
implicate [2] 65/17 65/17
implicated [1] 34/20
implicating [1] 73/11
implication [1] 85/10
implications [3] 19/25 23/6 33/1
important [3] 50/13 64/22 77/5
improper [1] 62/4
in [291]
incarcerated [4]
include [4]
includes [1] 86/16
including [1] 90/24
incompetent [3] 32/15 62/9 64/16
inconsistent [4]
incorporated [1] 4/13
incredible [1] 66/22
incriminating [2] 70/10 70/22
independent [1] 27/1
indicate [2] 12/4 55/1
indicated [4]
indicates [1] 42/8
indicating [1] 99/11
indictment [1] 15/17
individual [3] 17/5 49/13 49/15
individuals [1] 26/13
ineffective [1] 61/19
ineffectiveness [1] 64/1
inference [3] 76/13 76/21 80/4
information [19]
informed [1] 86/14
inherent [1] 88/13

inherently [1] 86/12
initial [8]
initiated [1] 86/1
inmate [1] 70/24
inquiry [1] 45/4
insist [1] 30/14
insists [1] 25/20
inspection [1] 11/4
instruct [1] 29/6
instructed [1] 66/22
instruction [2] 4/1 4/18
instructions [13]
intellectual [1] 49/14
intelligent [1] 49/12
intend [1] 15/24
intended [4]
intending [3] 15/2 70/2 77/13
intends [4]
Intensity [1] 55/4
intent [1] 4/25
intention [1] 10/6
inter [1] 55/12
inter-agency [1] 55/12
interest [2] 41/15 81/24
interested [3] 35/3 45/9 65/7
intern [1] 3/12
interpret [1] 49/18
interpretation [1] 76/23
interview [2] 78/3 82/21
interviewed [2] 10/3 47/25
interviewing [1] 85/23
intimidate [1] 49/6
intimidated [1] 85/1
intimidating [1] 85/12 86/9
intimidation [2] 78/13 80/12
into [24]
intrinsic [4]
introduce [3] 15/2 15/24 63/12
introduction [1] 62/2
investigate [2] 85/8 85/21
involuntary [1] 18/11
involved [9]
involvement [1] 41/8
irony [1] 82/19
irrespective [1] 22/10
is [282]
isn't [7]
issue [11]
issues [11]
it [208]
it's [57]
items [1] 30/3
its [4]
itself [3] 40/22 78/10 80/7

## J

J-A-R-V-I-S [1] 20/12
jail [4]
jailhouse [1] 70/25
jam [1] 6/4
JARVIS [23]
jeopardy [1] 78/24
Jerry [1] 75/10
Jiles [1] 68/7
JOAQUIN [3] 1/5 20/23 100/8
job [1] 8/14
John [1] 77/1
jointly [1] 97/21
jointly-approved [1] 97/21
Jonathan [3] 1/16 1/17 3/10
Jones [2] 13/4 74/10
JOSE [1]
judge [35]

jump [2] 20/5 41/19
jumped [1] 29/20
jurisdiction [6]
jurisdictions [1] 25/18
juror [4]
jurors [6]
jury [27]
just [56]
justice [1] 43/20
justify [1] 62/19

## K

keep [8]
kill [4]
killed [4]
killer [1] 89/19
killing [3] 68/14 79/24 86/16
kilogram [1] 55/19
kilograms [2] 41/3 44/13
kilos [4]
kind [4]
kinds [1] 88/21
knew [4]
know [78]
knowledge [5]
known [5]
knows [3] 11/22 74/6 82/18

## L

laid [3] 67/19 67/23 77/17
landmine [1] 93/8
Lane [1] 1/21
large [3] 12/19 16/15 44/11
larger [1] 41/13
last [5]
late [1] 31/5
later [10]
Lavia [2] 23/21 23/21
law [11]
laws [1] 4/18
lawyer [35]
lawyer's [1] 66/19
lawyers [1] 63/8
lead [1] 64/4
leading [4]
learn [1] 3/14
learned [1] 22/24
least [7]
leave [3] 58/22 93/20 99/12
led [5]
left [2] 58/9 61/17
legitimate [1] 87/1
length [1] 9/7
lengthy [1] 26/23
Leonard [2] 26/8 26/11
less [2] 54/9 82/8
let [26]
let's [8]
letter [23]
letters [1] 32/24
level [1] 81/23
liberty [1] 88/10
lie [5]
lied [3] 51/1 64/22 65/14
lies [1] 52/4
like [29]
liked [1] 26/16
likely [1] 97/5
limine [5]
limit [1] 94/23
limited [2] 94/11 94/22
line [1] 90/13
lines [1] 31/9

## L

link [2] 68/12 70/16
Lisa [4]
list [3] 6/11 10/19 14/8
listed [2] 58/12 58/15
listen [3] 21/21 56/25 82/13
listening [2] 4/4 95/11
literature [1] 32/22
little [10]
LLC [1] 1/14
local [4]
long [23]
Long's [3] 71/21 71/24 72/3
longer [2] 8/19 96/12
look [18]
looked [2] 12/18 31/21
looking [5]
looks [1] 5/15
loop [1] 39/24
lost [1] 62/16
lot [8]
loud [1] 84/15

## M

ma'am [37]
machine [2] 100/5 100/13
made [34]
magic [1] 10/13
magistrate [4]
main [1] 90/20
maintained [1] 22/18
majority [1] 21/7
make [38]
makes [4]
making [4]
male [2] 41/1 60/22
man [4]
manage [2] 66/14 98/9
mandatory [1] 24/4
manifestly [1] 11/23
manner [1] 21/11
many [7]
March [1] 100/16
marijuana [1] 55/8
mark [3] 3/6 5/13 38/1
marked [4]
Marking [1] 38/12
marshal [2] 6/1 6/15
marshals [1] 99/8
MARTIN [2] 1/12 3/5
Marty [1] 74/16
MARYLAND [21]
material [1] 64/3
math [1] 10/13
mathematician [1] 10/14
matter [14]
matters [3] 3/22 10/16 22/17
may [37]
maybe [9]
McAllen [7]
me [95]
mean [23]
meaning [2] 52/3 62/12
means [3] 26/10 40/3 92/17
meant [1] 93/7
mechanical [1] 1/24
meet [2] 41/1 60/7
meeting [4]
meetings [3] 19/11 33/19 56/6
Meghan [1] 3/11
men [2] 92/5 92/6
menacing [2] 85/11 86/8

mental [1] 12/1
mention [3] 17/2 55/23 56/1
mentioned [7]
mess [1] 88/17
messages [1] 34/12
met [5]
method [1] 95/9
mic [1] 11/12
middle [2] 54/4 75/25
might [15]
Mike [6]
miles [1] 62/25
mind [3] 38/6 50/20 50/25
minimums [1] 24/4
minor [1] 14/18
minute [3] 36/8 38/6 99/15
minutes [2] 90/3 96/12
Miranda [10]
Mirandized [1] 44/18
misconduct [1]
mistake [1] 45/23
mistrial [1] 84/8
modifications [1] 7/22
modified [2] 7/13 7/15
moment [6]
moments [1] 18/12
Monday [2] 7/6 96/8
money [1] 55/14
Moore [1] 3/11
moot [3] 14/3 14/8 15/4
Morale [1] 19/9
MORALES [96]
Morales' [12]
more [14]
morning [11]
most [6]
motion [33]
motions [8]
motive [1] 72/8
move [1] 16/17
moved [2] 15/19 17/14
moving [2] 54/9 98/22
Mr [43]
Mr. [191]
Mr. Ericson [1] 94/9
Mr. Ericson's [1] 94/21
Mr. Jarvis [15]
Mr. Jerry [1] 75/10
Mr. Jones [2] 13/4 74/10
Mr. Leonard [1] 26/11
Mr. Long [10]
Mr. Long's [1] 71/21
Mr. Miranda [1] 45/5
Mr. Morale [1] 19/9
Mr. Morales [81]
Mr. Morales' [10]
Mr. Needleman [9]
Mr. Needleman's [1] 50/1
Mr. Proctor [6]
Mr. Ray [21]
Mr. Ray's [3] 77/6 80/10 93/14
Mr. Ruter [4]
Mr. Stokes [2] 77/10 77/21
Mr. Zucker [17]
Mr. Zucker's [3] 76/3 80/8 80/9
Ms [18]
Ms. [16]
Ms. Ferko [14]
Ms. Wilkinson [2] 54/19 82/12
much [17]
Mulberry [1] 1/15
municipal [1] 55/10
murder [26]

murderer [1] 82/24
murders [4]
musings [1] 89/25
my [58]
myself [2] 5/20 28/16

## N

name [12]
named [1] 26/8
narcotics [1] 55/14
narrowed [1] 97/18
nature [3] 35/11 35/14 80/5
NCIC [2] 11/14 11/17
near [1] 41/5
necessarily [2] 25/19 57/2
need [23]
Needleman [15]
Needleman's [1] 50/1
needs [5]
negotiated [1] 25/22
Neither [1] 53/19
never [18]
new [4]
newspaper [1] 94/23
next [9]
nice [1] 80/20
no [40]
nobody [4]
non [1] 55/10
non-federal [1] 55/10
nonappearance [1] 29/25
None [1] 68/17
nor [1] 53/19
not [141]
note [4]
notereading [1] 1/24
notes [4]
nothing [5]
notice [5]
notion [2] 32/14 80/7
now [24]
nuance [1] 77/18
nuances [1] 4/18
number [15]
numbers [2] 11/11 30/3
numerous [1] 68/22
NW [1] 1/17

## O

oath [1] 72/14
object [8]
objecting [1] 16/19
objection [12]
objections [5]
obligation [4]
obligations [1] 12/17
observing [1] 95/22
obtained [4]
obtaining [1] 29/16
obviously [14]
occupied [1] 56/10
occurred [2] 19/12 58/5
odds [1] 76/4
off [5]
offender [2]
offenders [1] 11/14
offense [1] 81/23
offer [6]
offered [4]
office [15]
officer [6]
officers [2] 6/14 12/1
offices [2] 1/14 54/9

## O

official [5]
officially [1] 39/7
often [2] 44/22 55/14
oftentimes [1] 55/6
oh [5]
okay [31]
on [142]
once [3] 10/8 11/5 24/12
one [64]
ones [4]
only [9]
open [9]
opened [1] 91/1
opening [12]
openings [5]
openly [1] 28/17
opens [1] 92/11
opinion [4]
opportunity [2] 64/20 65/6
opposed [1] 63/24
or [81]
order [9]
ordered [2] 29/1 74/8
other [22]
others [2] 9/16 25/5
otherwise [3] 10/2 65/8 79/22
our [21]
out [37]
outraged [1] 81/4
outside [7]
over [4]
overall [1] 84/2
Overruled [1] 50/22 51/23
overwhelmingly [1] 75/2
own [5]

## P

p.m [1] 39/14
Pabon [1] 71/17
PACER [2] 31/21 38/19
package [1] 15/7
page [2] 7/23 26/23
pages [2] 30/3 100/11
painfully [1] 68/19
paper [3] 53/19 94/2 94/6
paperwork [2] 38/20 39/11
paramount [1] 76/11
paraphrasing [1] 31/12
parcel [1] 63/12
park [2] 91/25 92/1
part [4]
participate [1] 84/9
participation [1] 89/14
particular [3] 10/18 11/1 11/2
particularly [1] 86/9
parties [3] 6/2 73/19 91/19
partner [1] 54/4
party [3] 74/2 74/2 89/11
past [1] 76/8
Pause [1] 61/11
penalties [1] 74/23
pending [1] 81/15
people [17]
per [4]
percent [1] 85/25
perfect [2] 14/20 33/13
perhaps [4]
period [2] 48/10 95/19
periods [1] 48/20
perjury [1] 74/24
permission [1] 3/11

person [12]
pertain [1] 32/17
phone [8]
physically [1] 5/8
pick [1] 10/8
picked [1] 97/10
piecing [2] 54/3 54/7
Pina [1] 62/25
pitfalls [1] 32/19
place [2] 87/15 89/2
plan [1] 45/7
plane [1] 44/9
plans [1] 9/6
plant [1] 64/25
plea [5]
pleasant [1] 79/18
please [9]
pled [2] 75/3 81/21
plenty [1] 6/16
plus [1] 10/10
point [12]
points [1] 9/18
police [3] 24/5 48/5 55/7
policy [1] 62/3
portions [1] 13/8
position [6]
possession [1] 27/5
possibility [1] 41/4
possible [1] 75/25
possibly [3] 25/23 46/25 96/23
potential [2] 7/9 85/9
potentially [1] 88/24
potted [1] 64/24
practice [12]
practices [2] 6/19 55/18
practitioner [1] 65/1
pray [1] 9/7
praying [1] 89/16
precautions [1] 78/24
precedent [3] 83/5 83/6 83/7
preclude [2] 78/20 95/10
precluded [1] 74/12
precludes [1] 62/2
predicament [6]
prefer [1] 73/13
preference [1] 10/18
prejudice [6]
prejudicial [1] 89/24
preliminary [8]
prepare [3] 7/1 32/20 47/15
prepared [4]
presence [7]
present [11]
presented [1] 84/17
presentence [14]
presents [1] 76/2
press [3] 81/4 95/25 96/5
pressed [1] 81/1
presume [1] 39/5
presumed [2] 24/5
presuming [1] 54/14
presumption [2] 44/4 87/5
pretrial [6]
pretty [6]
prevent [1] 68/15
printed [1] 10/19
prior [14]
prison [4]
prisoners [1] 80/7
private [3] 14/15 44/7 55/19
privilege [6]
privileged [3] 22/8 23/11 80/4
privileges [1] 22/21

probability [2] 84/6 84/7
probably [22]
probation [1] 12/1
problem [6]
problematic [1] 78/22
procedures [1] 97/11
proceed [2] 70/7 73/13
proceeding [5]
proceedings [7]
process [1] 12/22
Proctor [31]
procured [2] 64/3 64/6
produced [1] 1/24
profess [1] 10/14
profession [1] 20/25
proffer [44]
proffered [3] 72/4 75/19 76/5
proffers [1] 34/16
prohibit [2] 62/4 68/2
prominent [1] 32/17
promised [1] 65/11
proof [4]
proper [2] 82/4 91/14
properly [3] 15/23 22/4 23/10
prophylactic [2] 63/14 95/9
proposed [1] 4/9
proposes [1] 81/10
prosecuted [1] 24/18
prosecution [3] 6/22 25/23 83/18
prosecutor [4]
prosecutors [3] 51/8 60/7 99/10
protect [5]
protected [3] 27/14 36/5 36/24
protecting [1] 63/20
protection [3] 27/10 27/19 32/24
protections [5]
prove [2] 70/16 71/20
proven [1] 4/5
provide [11]
provided [8]
provides [1] 74/3
provision [1] 84/25
public [2] 34/19 62/3
published [2] 94/6 95/18
pull [2] 49/20 72/16
punish [1] 63/17
punishing [1] 63/15
punishment [1] 70/16
purported [1] 71/4
purpose [4]
purposes [1] 93/12
put [20]
putting [4]

## Q

qualifying [1] 11/19
quarrel [1] 28/1
queen [2] 25/18 25/21
question [29]
questioned [2] 82/17 82/20
questions [10]
quick [2] 18/15 60/18
quickly [3] 10/22 42/13 42/14
quiet [1] 76/11
quite [4]

## R

raise [8]
raised [6]
ramifications [1] 75/24
Raoul [1] 41/2
rat [1] 50/5
rather [5]

**R**

rationale [1] 63/16
Ray [28]
Ray's [5]
re [1] 71/6
re-do [1] 71/6
read [10]
readily [1] 71/13
reading [1] 10/12
reads [1] 4/3
ready [4]
real [1] 78/14
really [12]
reason [5]
reasonable [1] 98/18
reasons [5]
recall [18]
received [4]
receiving [1] 53/13
recess [2] 98/21 99/15
recognize [2] 20/20 40/14 58/16
recollection [12]
record [11]
recorded [1] 1/24
Recross [2] 2/6 59/21
Recross-examination [2] 2/6 59/21
redacted [4]
redirect [5]
reduce [1] 9/18
reduced [2] 36/25 81/23 82/19
reduction [1] 10/23
redundancies [1] 5/19
reference [1] 94/4
referenced [1] 16/20
reflect [2] 87/23 88/16
refresh [3] 37/22 38/8 42/17
refreshing [1] 39/10
refused [1] 88/8
regard [14]
regarding [1] 70/23
reinforced [1] 95/22
reinforcing [1] 95/10
related [4]
relates [1] 16/1
relating [1] 22/3
Relevance [1] 46/5
relevant [3] 45/4 67/12 81/13
relieve [1] 92/18
rely [1] 84/4
remain [3] 42/23 99/8 99/8
remedy [1] 63/23
remember [17]
remind [1] 6/19
renew [2] 13/1 13/16
rep [1] 58/10
Repeat [1] 28/18
report [16]
reported [1] 100/5
reporter [11]
reports [4]
represent [3] 8/5 19/5 38/25
representation [13]
representations [1] 71/19
represented [9]
representing [9]
represents [1] 65/2
request [3] 14/25 33/4 76/13
requested [2] 80/23 86/2
requesting [1] 4/19
required [6]
requisite [1] 13/11
resent [1] 85/10

resolve [1] 53/4
respect [7]
respond [4]
responded [2] 15/20 17/15
response [8]
restricts [1] 74/1
result [1] 62/15
retained [3] 38/25 40/7 54/9
return [1] 61/1
returned [1] 34/4
reversed [2] 63/3 64/5
review [2] 9/24 51/15
reviewed [1] 51/17
reviewing [1] 9/13
rid [2] 5/19 14/24
right [82]
rightly [1] 86/18
rights [1]
Rio [1] 41/3
risks [1] 88/13
RMR [1] 1/20
Rob [2] 33/20 92/5
Robert [5]
ROGER [2] 1/8 5/21
room [3] 35/25 36/2 61/17
rounding [1] 96/17
routine [5]
Royka [1] 3/6
rudimentary [1] 29/22
ruin [1] 46/22
rule [17]
rules [7]
ruling [7]
running [2] 92/3 92/9
Ruter [6]
RWT [3] 1/3 3/4 100/9
RWT-12-0480 [3] 1/3 3/4 100/9

**S**

safety [2] 76/11 84/23
said [37]
same [4]
sanction [1] 78/18
Sand [5]
SANDRA [2] 1/11 3/4
sat [2] 25/4 30/12
saw [2] 64/20 92/8
say [51]
saying [17]
says [19]
scared [5]
scars [1] 73/21
scenario [1] 79/2
scene [2] 92/3 92/9
scheduling [3] 14/11 56/24 96/21
scheduling-wise [1] 14/11
scope [3] 81/17 82/3 82/5
screen [1] 9/19
se [2] 17/25 61/18
seated [2] 3/19 19/2
second [11]
Secondly [1] 80/5
secret [3] 84/22 84/23 84/25
secretaries [1] 54/6
see [25]
seeing [1] 57/4
seek [1] 93/3
seeking [1] 11/7 63/6
seeks [2] 63/12 65/18
seem [2] 69/12 83/9
seems [4]
seen [3] 67/5 90/22 92/1
Seifurt [1] 5/18 7/22

seizures [1] 55/15
selected [2] 18/9 88/11
selection [4]
sense [1] 70/5
sensitive [1] 9/18
sentence [3] 40/24 81/15 82/19
sentencing [6]
separate [1] 87/4
separation [1] 86/4
September [4]
September 15 [1] 40/2
September 24th [1] 3/8
series [1] 38/20
serious [1] 49/17
service [2] 29/22 97/16
set [4]
setting [1] 18/8
several [5]
shall [1] 74/4
sharp [1] 49/14
she [20]
she's [2] 24/14 24/15
sheet [8]
Sheriff's [2] 54/23 55/3
ship [1] 66/14
shooter [1] 92/10
shooting [1] 91/25
shoplifting [1] 74/11
short [3] 20/19 26/22 97/21
shorthand [3] 9/22 100/6 100/13
shot [2] 77/19 77/20
should [15]
shouldn't [1] 16/25
shout [1] 58/1
show [3] 27/6 68/10 70/1
showed [1] 54/19
showing [4]
shows [2] 69/5 71/23
shred [1] 53/23
side [6]
sides [3] 6/13 7/2 89/21
sign [7]
signature [2] 78/2 78/2
signed [2] 87/25 89/1
significance [2] 44/19 89/1
significant [7]
significantly [2] 88/1 88/24
silent [1] 42/24
similar [2] 72/18 83/21
simple [2] 6/21 14/24
simplistic [1] 5/8
simply [2] 74/13 92/16
since [3] 10/21 16/18 21/5
single [1] 4/5
sir [30]
sit [2] 3/12 58/18
sits [1] 96/16
sitting [10]
six [6]
six-kilogram [1] 55/19
six-week [2] 9/5 69/17
sixth [3] 56/7 56/10 84/2
skewed [1] 30/17
smartest [1] 66/13
Snyder [5]
so [128]
sold [1] 75/14
solicit [1] 82/5
solid [1] 9/1
solitary [1] 49/3
solved [1] 71/13
some [47]
somebody [11]

Case 1:12-cr-00480-DKC   Document 177   Filed 03/07/13   Page 109 of 110

**S**

somehow [1] 18/6
someone [13]
someone's [1] 62/5
something [29]
sometime [1] 39/19
sometimes [2] 32/22 32/23
soon [1] 77/2
sorry [4]
sort [4]
sorts [1] 68/17
sound [3] 28/6 31/22 41/9
sounds [3] 63/19 95/14 98/18
South [1] 1/12
SOUTHERN [1] 1/2
speak [9]
speaking [1] 74/25
Special [2] 3/6 24/22
specific [2] 17/6 74/3
specifically [7]
Spell [1] 20/11
spend [1] 12/8
spin [1] 66/7
split [1] 98/13
spoke [4]
spoken [3] 8/22 67/8 90/10
stakes [1] 47/2
stand [4]
standard [2] 33/4 33/7
standards [1] 66/11
standpoint [1] 69/3
Stanley [5]
stapled [1] 30/4
start [8]
started [1] 55/1
state [13]
State's [1] 56/9
statement [29]
statements [37]
states [18]
statutory [1] 24/4
steer [1] 91/12
stenography [1] 1/24
step [6]
still [8]
Stokes [2] 77/10 77/21
stop [4]
story [7]
stranger [2] 43/19 73/20
strangers [1] 9/15
strategic [1] 88/12
strategy [1] 89/3
Street [2] 1/12 1/15
stricken [1] 70/17
Strickland [3] 19/23 62/7 66/11
Strickland-type [1] 62/7
strictly [2] 27/14 55/16
strikes [1] 10/10
strongly [1] 89/9
stuck [1] 9/9
student [1] 3/12
stuff [4]
style [2] 8/15 8/16
subject [8]
subjects [1] 24/4
submit [1] 97/21
submitted [1] 5/13
subpoena [4]
subpoenaed [4]
subscribed [1] 100/15
subsequent [1] 27/15
substance [3] 8/16 12/2 19/7

substituted [1] 7/14
successful [1] 84/8
such [3] 44/24 50/13 56/19
suddenly [1] 98/20
sufficiently [1] 35/2
suggest [1] 79/19
suggesting [1] 68/11
suggestion [1] 66/20
suggests [1] 70/15
Suite [1] 1/18
summarize [1] 99/3
supposed [2] 63/19 84/24
supposedly [1] 74/22
suppress [2] 17/14 17/16
Supreme [2] 62/11 68/7
sure [26]
surmising [1] 31/18
suspect [2] 26/11 78/11
suspiciously [1] 88/22
Sustained [3] 35/19 37/16 51/4
swear [1] 77/1
swoop [1] 17/24
sworn [1] 18/25
system [1] 43/20

**T**

ta [1] 4/25
table [4]
take [19]
taken [3] 4/12 24/7 100/13
takes [3] 13/20 76/1 99/9
tale [5]
talk [35]
talked [8]
talking [14]
tall [3] 66/18 66/21 66/23
tape [2] 92/4 100/14
tecum [1] 53/14
teeth [2] 49/21 63/5
telephone [1] 56/18
tell [40]
telling [3] 19/17 66/4 89/3
ten [4]
terminology [1] 25/21
terms [11]
terrible [1] 65/3
Terry [1] 26/8
test [1] 68/16
testified [6]
testify [11]
testifying [3] 46/25 68/15 94/22
testimony [20]
Texas [18]
than [16]
Thank [15]
that [573]
that's [56]
their [15]
them [43]
themselves [3] 4/17 83/12 99/11
then [32]
theory [5]
there [84]
there's [26]
therefore [5]
Thereupon [1] 18/22
these [17]
they [52]
they'll [1] 8/13
they're [12]
they've [3] 6/17 72/16 91/1
thin [3] 54/15 76/23 80/6
thing [17]

things [17]
think [85]
thinking [2] 96/8 96/22
thinks [3] 8/15 75/4 89/18
third [6]
this [157]
those [23]
though [1] 90/21
thought [2] 12/16 84/20
thoughts [1] 16/9
threaten [2] 48/25 49/6
threatened [3] 49/8 49/15 49/16
threatening [1] 85/11
three [11]
threshold [1] 55/13
threw [1] 45/21
throat [1] 96/18
through [11]
throughout [2] 22/25 56/15
Thursday [3] 13/5 13/5 13/7
tickets [2] 21/12 21/13
time [45]
timeframe [1] 39/18
timeline [1] 30/17
times [3] 43/23 50/2 93/3
timing [1] 69/10
tired [1] 97/4
TITUS [6]
today [19]
together [4]
told [30]
too [4]
top [4]
topic [1] 34/15
torn [1] 27/18
totality [2] 18/9 66/6
totally [1] 76/4
touch [1] 48/23
Tower [1] 56/7
track [1] 32/13
traffic [3] 6/4 21/12 21/13
trafficking [3] 41/8 41/17 55/5
trained [1] 8/13
training [2] 42/5 44/16
transcript [6]
transportation [1] 41/2
trial [37]
trials [1] 6/20
tried [4]
trip [1] 93/8
trouble [1] 44/19
troubled [1] 85/6
truck [1] 64/21
trucking [1] 6/7
true [18]
truth [2] 37/3 50/18
truthful [8]
truthfully [1] 31/16
try [7]
trying [5]
Tuesday [12]
turned [1] 77/19
turns [1] 91/13
two [22]
two-day [1] 59/2
two-week [1] 54/14
type [2] 62/7 79/16
typical [7]
typically [3] 12/1 26/21 27/15
typographical [1] 15/17

**U**

U.S [10]

Case 1:12-cr-00480-DKC   Document 177   Filed 03/07/14   Page 110 of 110

## U

Uh [1]  52/6
Uh-huh [1]  52/6
ultimately [2]  66/17 96/1
uncontroverted [1]  3/25
under [19]
underneath [1]  58/9
understand [11]
understanding [8]
Understood [2]  91/17 96/4
undisputed [1]  4/21
unethical [1]  78/19
unfamiliar [1]  30/19
unfolds [1]  76/19
unique [1]  19/22
UNITED [18]
universe [2]  16/2 16/16
unless [7]
unredacted [1]  13/11
unrepresented [1]  76/23
unring [1]  68/8
unrung [1]  73/4
unseal [1]  15/10
until [5]
unusual [1]  44/23
up [46]
uphill [1]  44/21
upon [5]
upset [1]  86/7
upside [1]  71/25
urge [1]  89/21
us [13]
use [9]
used [6]
usher [1]  93/6
using [2]  25/21 26/10
usual [1]  41/18
usually [2]  26/23 42/13

## V

validity [1]  68/24
Valley [1]  41/3
value [1]  83/12
various [1]  60/10
vary [1]  26/5
version [6]
versus [3]  28/10 28/10 100/8
very [31]
videotaped [1]  68/5
view [5]
violation [5]
violations [1]  30/23
virtue [1]  95/22
visit [1]  57/13
voir [2]  9/12 9/12
voluminous [1]  54/16
voluntariness [2]  17/19 82/21
voluntary [3]  17/25 18/7 18/11
voucher [2]  61/5 61/8

## W

wait [2]  57/14 59/14
waive [2]  19/18 22/20
waived [3]  10/2 19/10 26/1
waiving [1]  23/4
walk [2]  52/17 75/12
wandering [1]  92/24
want [41]
wanted [15]
wanting [1]  66/14
wants [6]
warehouse [1]  54/12

warning [1]  65/19
warnings [1]  40/17
was [190]
Washington [2]  1/18 25/20
wasn't [11]
watcher [1]  96/19
way [16]
we [144]
we'd [1]  76/17
we'll [9]
we're [25]
we've [4]
Wednesday [11]
week [9]
weekend [1]  4/11
weeks [11]
welcome [1]  94/16
well [62]
well-known [1]  62/6
went [11]
were [34]
weren't [2]  54/17 57/12
what [143]
what's [3]  17/10 78/18 94/23
whatever [5]
when [42]
where [16]
whereof [1]  100/15
whether [24]
which [27]
while [5]
white [3]  60/22 92/6 92/9
who [55]
who's [6]
whoever's [1]  6/22
whom [2]  69/22 70/25
whopper [1]  52/17
whose [1]  34/18
why [18]
wide [1]  83/22
widely [1]  26/5
WILKINSON [18]
will [59]
willing [4]
window [1]  64/20
wise [2]  14/11 83/14
wish [1]  93/2
withdraw [1]  40/2
Withdrawn [1]  51/5
within [6]
without [17]
witness [70]
witness' [1]  51/3
witnesses [34]
won't [2]  16/7 72/2
wonder [1]  98/5
word [1]  58/9
words [6]
work [9]
worked [2]  8/23 50/19
workers [1]  92/1
working [2]  25/20 25/23
world [1]  89/19
worst [1]  78/13
would [101]
wouldn't [8]
Wright [1]  87/10
write [1]  71/3
writing [1]  36/25
writted [2]  6/3 6/3
written [3]  32/18 67/7 78/11
wrong [2]  57/15 63/3
wrongly [1]  86/18

wrote [1]  57/15

## Y

yard [2]  78/4 78/6
year [1]  76/5
years [5]
yes [91]
yet [4]
you [319]
you'd [3]  13/8 26/21 27/5
you'll [2]  7/23 16/8
you're [22]
you've [8]
young [1]  92/2
your [124]
yourself [1]  48/11

## Z

Zucker [24]
Zucker's [3]  76/3 80/8 80/9